UNITED STATES DISTRICT COURT 2014 APR 17 PM 4: 27
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.

MITCHELL HOLLAND
WARREN ROSENFELD
JUAN LUIS HERNANDEZ RILL
RONDELL SCOTT HEDRICK

Case No.    3:14-cr- 73-J-32JRK
Ct. 1:      18 U.S.C. §§ 1349 & 1343
Cts. 2 – 17:  18 U.S.C. §§ 1343 & 2
Forfeiture:  18 U.S.C. § 981(a)(1)(C) &
            28 U.S.C. § 2461(c)

## INDICTMENT

The Grand Jury charges:

## COUNT ONE
## (CONSPIRACY TO COMMIT WIRE FRAUD)

Between in or about mid 2009, through in or about early 2010, in Duval

County, in the Middle District of Florida, and elsewhere,

MITCHELL HOLLAND,
WARREN ROSENFELD,
JUAN LUIS HERNANDEZ RILL,
RONDELL SCOTT HEDRICK,

the defendants herein, did knowingly and willfully combine, conspire, confederate

and agree with others, known and unknown to the grand jury, to devise and intend

to devise a scheme and artifice to defraud, and to obtain money by means of

materially false and fraudulent pretenses, representations, and promises, and for

the purpose of executing and attempting to execute the scheme and artifice to

defraud to knowingly transmit and cause to be transmitted by means of wire, in

interstate and foreign commerce, certain writings, signs, signals, pictures and

sounds, in violation of Title 18, United States Code, Section 1343.

At all times material,

## BACKGROUND

1.     The defendant, MITCHELL HOLLAND (HOLLAND), was a resident of California.   HOLLAND was licensed to conduct Series 3 investment transactions from approximately August 1997 through October 1999.   A Series 3 permits the holder to sell or solicit orders for registered futures or options on commodities with registered firms.   HOLLAND held no other securities or other investment related licenses.

2.     HOLLAND incorporated Vital Funds, Inc. on or about February 24, 2009, in Florida, as an entity to assist HOLLAND in facilitating his role in furthering fraudulent investments into fictitious high yield investments/securities, including leased Certificates of Deposit (leased CDs).

3.      The defendant, WARREN ROSENFELD (ROSENFELD), was a resident of Texas.   ROSENFELD held no securities related licenses, and had no relevant training or experience in international investment markets.

4.     ROSENFELD incorporated Aster Capital, Inc. in Texas on February 4, 2008, as an entity to assist ROSENFELD in facilitating his role in furthering fraudulent investments into fictitious high yield investments/securities.

5.     The defendant, JUAN LUIS HERNANDEZ RILL (HERNANDEZ) was a resident of Spain.   HERNANDEZ was a purported representative of Unistate Investments Savings and Loans Limited (UNISTATE), a shell company

incorporated in New Zealand on or about June 5, 2008.   UNISTATE was

promoted as an entity that could facilitate and secure high yield investments, such

as leased CDs.   UNISTATE was a shell company that transacted no legitimate

banking business.

      6.      The defendant, RONDELL SCOTT HEDRICK (HEDRICK), was a

resident of North Carolina.   HEDRICK held no securities or investment licenses

and had no relevant training or experience in international investment markets.

      7.      HEDRICK incorporated Hedrick Consulting, Inc. in North Carolina on

or about July 27, 1999, which was used to assist HEDRICK in facilitating his role in

furthering fraudulent investments into fictitious high yield investments/securities.

      8.      CHRISTOPHER JAIJAIRAM (JAIJAIRAM) was a resident of New

York.   JAIJAIRAM held no securities or investment licenses and had no relevant

investment training or experience in international investment markets.

      9.      JAIJAIRAM incorporated CJ Group Services, Inc., in New York, on

September 23, 2008, as an entity to assist JAIJAIRAM in facilitating his role in

procuring and furthering fraudulent investments into fictitious high yield

investments/securities.   JAIJAIRAM was represented as a UNISTATE

representative in the United States.   JAIJAIRAM represented that JAIJAIRAM

worked for HERNANDEZ, who JAIJAIRAM never met in person.

      10.      Glen Elliott SMITH (SMITH) was a resident of Louisiana.   SMITH

held no securities or investment licenses and had no relevant investment training

or experience in international investment markets.

11.    SMITH was affiliated with Cole's Cash Flow Specialists, LLC to facilitate his role in procuring and furthering fraudulent investments into the fictitious high yield investments/securities.

12.    Though HOLLAND, ROSENFELD, HERNANDEZ, HEDRICK, SMITH, and JAIJAIRAM worked together and had material roles in securing and facilitating the fraudulent investments into fictitious high yield investments/securities (primarily leased CDs), these individuals never met each other in person.   Their relationships were entirely based upon e-mail, telephone, and other electronic communications.

13.    Commercial Escrow Services was a company incorporated in California which provided escrow services to a variety of companies, including Vital Funds, Inc., for a fee.

14.    The Depository Trust and Clearing Corporation (D.T.C.C.) is a private yet highly regulated entity that operates as a clearinghouse that standardizes the post-trade processing of financial transactions for institutions involved in global trading markets.

15.    A Committee on Uniform Securities Identification Procedures (CUSIP) number is an identification number assigned to securities, including stocks and registered bonds, which specifically identifies each security.   A CUSIP number is specific to an individual stock or bond.   The same CUSIP number cannot identify two different securities.

16.    G.Y.S., a Jacksonville, Florida businessman in the construction

4

industry, was a victim of the alleged fraudulent scheme.   After corresponding with other individuals, including SMITH, G.Y.S. was referred to HOLLAND (Vital Funds) and HEDRICK (Hedrick Consulting) to participate in a fictitious international banking investment explained to G.Y.S. as the leasing of a $200,000,000 CD (hereinafter "the $200 Million Leased CD"), which could be monetized and traded in a platform trading program only available for such significant assets.   Based on false and fraudulent representations and promises, G.Y.S. agreed to make an initial payment of $622,500 via wire transfer to Commercial Escrow Services to initiate the leasing of the high yield investment CD.   Based on false and fraudulent representations and promises, G.Y.S. understood that the initial $622,500 investment, which G.Y.S. wired to Commercial Escrow Services on or about November 4, 2009, would permit G.Y.S. access to the $200 Million Leased CD to invest it in special international trading programs or obtain advanced funds, which would net the capital required for G.Y.S. to pay the 7% fee of $14,000,000 due to UNISTATE within sixty (60) days of the initial leasing of the $200 Million Leased CD.

17.   D.J., a resident of Massachusetts and principal of Deal Structurers.com, Inc. (Deal Structurers), an entity incorporated to conduct real estate investment transactions, was a victim of the alleged fraudulent scheme. D.J. was ultimately introduced to HOLLAND at Vital Funds to participate in a fictitious international banking investment explained to D.J. as the leasing of a $10 Million Leased CD and Proof of Funds Account, which was to be used as collateral

5

for a non-profit company to borrow against.   Based on false and fraudulent

representations and promises, D.J. wired an initial payment of $150,000 to

Commercial Escrow Services on or about June 17, 2009.   On or about June 18,

2009, Commercial Escrow Services disbursed (via wire transfer) the $150,000 as

follows:   Vital Funds and HOLLAND ($61,825), Aster Capital and ROSENFELD

($61,825), and SMITH ($25,000).   Commercial Escrow Services retained an

escrow fee of $1,350.   No such investment ever existed.

18.    J.N., a resident of Texas and a principal of WCSP Country Club

Offices Plaza, LLC, an entity attempting to secure funds for a real estate

development project, was a victim of the alleged fraudulent scheme.   J.N. was

ultimately introduced to HOLLAND at Vital Funds to participate in a fictitious

international banking investment explained to J.N. as the leasing of a $4 Million

Leased CD, which was to be used by J.N. to secure funding for a specific ongoing

real estate development.   Based on false and fraudulent representations and

promises, J.N. wired initial payments of $250,000 and $125,000 to Commercial

Escrow Services on or about September 25 and September 28, 2009,

respectively.   On or about October 1, 2009, Commercial Escrow Services

disbursed (via wire transfer) the $375,000 as follows:   Aster Capital and

ROSENFELD ($204,756), and UNISTATE ($168,394).   Commercial Escrow

Services retained an escrow fee of $1,850.   On or about October 2, 2009, Aster

Capital (ROSENFELD) wired $80,169 to Vital Funds (HOLLAND).   No such

investment ever existed.

19.     B.W., a resident of New York, an individual involved in a venture to raise capital to start or purchase a computer business, was a victim of the alleged fraudulent scheme.   B.W. was ultimately introduced to HOLLAND at Vital Funds to participate in a fictitious international banking investment explained to B.W. as the leasing of a $100 Million Leased CD, which was to be used by B.W. to secure funding for the business venture.   Based on false and fraudulent representations and promises, B.W. wired an initial payment of $300,000 to Commercial Escrow Services on or about November 17, 2009.   On or about November 19, 2009, Commercial Escrow Services disbursed (via wire transfer) the $300,000 as follows:   Vital Funds and HOLLAND ($32,648), Aster Capital and ROSENFELD ($92,647), and UNISTATE ($172,005).   Commercial Escrow Services retained an escrow fee of $2,700.   No such investment ever existed.

20.     R.S., a resident of Tennessee and a principal of Alpha, LLC, an entity incorporated for real estate development, was a victim of the alleged fraudulent scheme.   R.S. was ultimately introduced to HOLLAND at Vital Funds to participate in a fictitious international banking investment explained to R.S. as the leasing of a $100 Million Leased CD, which was to be used by R.S. to secure funding for real estate developments.   Based on false and fraudulent representations and promises, R.S. facilitated the wiring of an initial payment of $400,000 to Commercial Escrow Services on or about November 17, 2009.   On or about November 19, 2009, Commercial Escrow Services disbursed (via wire transfer) the $400,000 as follows:   Vital Funds and HOLLAND ($113,098), Aster

7

Capital and ROSENFELD ($113,097), and UNISTATE ($172,005).   Commercial

Escrow Services retained an escrow fee of $1,800.   No such investment ever

existed.

21.    Aurora Asset Management, LLC (Aurora), a Texas corporation, was

a victim of the fraudulent scheme.   A representative of Aurora facilitated the wiring

of an initial payment of $450,000 to Commercial Escrow Services on or about

December 30, 2009 to further the investment into the leasing of a $100 Million

Leased CD.   On or about January 4, 2010, Commercial Escrow Services

disbursed (via wire transfer) the $450,000 as follows:   Vital Funds and HOLLAND

($149,391), Aster Capital and ROSENFELD ($131,890), and UNISTATE

($165,669).   Commercial Escrow Services retained an escrow fee of $3,050.   No

such investment ever existed.

## MANNER AND MEANS

### General Allegations – Fictitious Leased CD Investment Deals

1.    It was part of the conspiracy that beginning in or about June 2009,

D.J. of Deal Structurers.com (Deal Structurers), and at a later time others

(including G.Y.S., J.N. and WCSP Country Club Office Plaza, LLC, B.W., R.S. and

Alpha, LLC, Aurora Asset Management, LLC, and others) were in contact with

HOLLAND, the principal of Vital Funds, during which HOLLAND falsely

represented that HOLLAND could access and facilitate investments into high yield

international investment markets, which included the leasing of Certificates of

Deposit (CDs).

2.      It was further part of the conspiracy that G.Y.S., D.J. and Deal Structurers, J.N. and WCSP Country Club Office Plaza, LLC, B.W., R.S. and Alpha, LLC, Aurora Asset Management, LLC, and others were required to pay Vital Funds a set-up fee to initiate the investment and establish an escrow account at Commercial Escrow Services.

3.      It was further part of the conspiracy that G.Y.S., D.J. and Deal Structurers, J.N. and WCSP Country Club Office Plaza, LLC, B.W., R.S. and Alpha, LLC, Aurora Asset Management, LLC, and others were enticed and directed to transfer via wire monies to Commercial Escrow Services for the purported investment in a high yield investment security, specifically a leased CD.

4.      It was further part of the conspiracy that Commercial Escrow Services was directed to transfer these monies, via wire transfers, to bank accounts held and/or controlled by HOLLAND, ROSENFELD, SMITH, UNISTATE (HERNANDEZ), and others for purportedly providing a valid high yield financial instrument, usually a leased CD.

5.      It was further part of the conspiracy that HOLLAND, ROSENFELD, HEDRICK, SMITH, HERNANDEZ, JAIJAIRAM, and others provided false and fraudulent documents to G.Y.S., D.J. and Deal Structurers, J.N. and WCSP Country Club Office Plaza, LLC, B.W., R.S. and Alpha, LLC, Aurora Asset Management, LLC, and others in support of the purported high yield investments. These false and fraudulent documents and the information therein included fake and invalid: (1) D.T.C. Service screen shots, (2) documents verifying the existence

9

of banks and bank accounts, and (3) CUSIP numbers.

6.     It was further part of the conspiracy that HOLLAND, ROSENFELD, SMITH, HEDRICK, JAIJAIRAM, HERNANDEZ, and others continued to solicit investors, obtain monies from investors, and divide these monies at an agreed upon percentage (set by the co-conspirators), for purportedly providing a financial instrument and/or high yield investment security as agreed upon and promised. The financial instruments and/or securities (primarily leased CDs) did not exist, and were thus fraudulent.

7.     It was further part of the conspiracy that these purported financial instruments/high yield security investments (none of which were legitimate) spanned in or about June 2009 through in or about early 2010.   Thus, none of the purported financial instrument/high yield security investments paid any investment returns.   During this time period, the alleged co-conspirators participated in various purported transactions set forth and collected a minimum of $2,297,500 plus initial escrow fees.

### G.Y.S. Investment into $200 Million Leased CD

8.     It was further part of the conspiracy that in or about November 2009, G.Y.S., the Jacksonville, Florida construction business owner, was introduced via e-mail to HOLLAND, the principal of Vital Funds.   HOLLAND falsely represented to G.Y.S. that HOLLAND could access and facilitate G.Y.S.'s investment into the $200 Million Leased CD.

9.     It was further part of the conspiracy that in early November 2009,

SMITH e-mailed documents titled Account Agreement and Escrow Agreement to G.Y.S. to initiate the investment into the $200 Million Leased CD.

10.     It was further part of the conspiracy that a representative of Cole's Cash Flow Specialists, LLC, referred G.Y.S. to HEDRICK, who incorporated Hedrick Consulting, Inc., to "monetize" the $200 Million Leased CD, or to convert the $200 Million Leased CD into capital that could be used and invested in special platform trading markets only available to such significant assets.

11.     It was further part of the conspiracy that in early November 2009, HEDRICK made false and fraudulent representations to G.Y.S. during an in person meeting concerning HEDRICK's significant experience and success in international high yield investment markets, and what G.Y.S. could expect from the leasing of the $200 Million Leased CD.

12.     It was further part of the conspiracy that JAIJAIRAM, purportedly working as a United States representative of UNISTATE, a fictitious banking entity, contacted G.Y.S. on behalf of HERNANDEZ (a purported executive with UNISTATE), to facilitate G.Y.S.'s investment into the $200 Million Leased CD, and falsely represented to G.Y.S. that UNISTATE was a legitimate foreign bank involved in high yield investment CDs, and that in other similar deals when JAIJAIRAM worked with HOLLAND, JAIJAIRAM made money.

13.     It was further part of the conspiracy that in early November 2009, based on the false and fraudulent representations made by SMITH, HOLLAND, HEDRICK and others, G.Y.S. wired $622,500 to Commercial Escrow Services as

an initial investment into the $200 Million Leased CD.

14.     It was further part of the conspiracy that instead of any investment into the $200 Million Leased CD, once G.Y.S. wired the $622,500 to Commercial Escrow Services in early November 2009, the $622,500 was transferred to various other accounts held by Vital Funds and HOLLAND, SMITH, Hedrick Consulting, Inc. and HEDRICK, UNISTATE, Aster Capital and ROSENFELD, and CJ Group Services, Inc. and JAIJAIRAM.   The $622,500 was not invested into any investment.

15.     It was further part of the conspiracy that HOLLAND, ROSENFELD, HEDRICK, and JAIJAIRAM failed to perform any proper due diligence into the fidelity of the $200 Million Leased CD investment, and that even though JAIJAIRAM held himself out as a representative of UNISTATE and HERNANDEZ, JAIJAIRAM had never been to any UNISTATE branch or met in person with HERNANDEZ or any other UNISTATE principal.   JAIJAIRAM e-mailed G.Y.S. a lengthy information sheet concerning the fidelity of high yield investment CDs, when, in fact, the high yield investment CDs did not exist.

16.     It was further part of the conspiracy that SMITH likewise failed to perform any proper due diligence into the fidelity of the high investment CDs, and that even though SMITH claimed to work in tandem with HOLLAND and Vital Funds, SMITH had never transacted any legitimate business with Vital Funds, or even met HOLLAND in person.

17.     It was further part of the conspiracy that in early November 2009,

12

when G.Y.S. inquired into proof of his initial investment into the $200 Million

Leased CD, a representative of Vital Funds e-mailed G.Y.S. information on how to

access the Depository Trust and Clearing Corporation (D.T.C.C.) "screen shot"

("D.T.C. screen shot"), which purportedly established proof of G.Y.S.'s investment

into the $200 Million Leased CD.   The information was fictitious, and contained a

CUSIP number (an identification number assigned to securities, which allows for

each security to be identified by legitimate investors), which was fictitious.

18.     It was further part of the conspiracy that HOLLAND, the principal of

Vital Funds, e-mailed the fictitious D.T.C. screen shot to G.Y.S. in early December

2009 referencing HEDRICK as the beneficiary of the $200 Million Leased CD

investment and indicating that the CD was issued by Chase Manhattan BWI

(British West Indies).

19.     It was further part of the conspiracy that HEDRICK (Hedrick

Consulting, Inc.) was listed as the beneficiary of the $200 Million Leased CD

investment because HEDRICK was the individual who would purportedly

"monetize" the $200 Million Leased CD, or convert the $200 Million Leased CD into

capital, which could then be used and invested into international high yield

platform trading programs.

20.     It was further part of the conspiracy that HOLLAND and HEDRICK

represented to G.Y.S., via various contractual agreements, that from the date

G.Y.S. made the initial $622,500 investment and received the D.T.C. screen shot,

G.Y.S. would be able to invest the $200 Million Leased CD into select international

trading programs for such assets or obtain advanced funds, which would allow G.Y.S. to pay the balance of the 7% fee (on the $200 Million Leased CD) to UNISTATE by on or about January 11, 2010.  HOLLAND and HEDRICK made false and fraudulent representations and promises that G.Y.S. could expect significant returns from the investment in leasing the $200 Million Leased CD.

21.    It was further part of the conspiracy that HOLLAND and HEDRICK represented to G.Y.S. that once G.Y.S. wired the initial $622,500 and then paid the balance of the 7% fee owed to UNISTATE ($14,000,000), G.Y.S. would have one calendar year during which to use the $200 Million Leased CD in special international platform trading programs only available to such high net worth assets.

22.    It was further part of the conspiracy that several weeks after G.Y.S. wired the initial $622,500 to Commercial Escrow Services, it became increasingly difficult for G.Y.S. to contact HEDRICK and HOLLAND.

23.    It was further part of the conspiracy that in late December 2009 and early 2010, HEDRICK and HOLLAND engaged in e-mail communications with G.Y.S. offering variations to the initial $200 Million Leased CD, which would permit G.Y.S. to extend the original 60 day period that G.Y.S. had to pay the balance of the 7% fee ($14,000,000) to UNISTATE so that HEDRICK could continue efforts to "monetize" the $200 Million Leased CD, and trade it as anticipated so that G.Y.S. would have additional time to pay the balance owed to UNISTATE.

24.    It was further part of the conspiracy that JAIJAIRAM sent e-mail

14

communications to G.Y.S. in early January 2010 informing G.Y.S. that UNISTATE was extending G.Y.S.'s deadline to February 11, 2010 for G.Y.S. to provide the balance of $14,000,000 to UNISTATE, so that HEDRICK could "monetize" the $200 Million Leased CD, and thus G.Y.S.'s initial investment of $622,500 was extended an additional 30 days.

25.     It was further part of the conspiracy that in early February 2010, HEDRICK and HOLLAND avoided communication with G.Y.S. concerning the soon to expire $200 Million Leased CD.

26.     It was further part of the conspiracy that in early February 2010, JAIJAIRAM (the purported UNISTATE representative) indicated that UNISTATE would issue a cease and desist letter to G.Y.S. because G.Y.S. had not paid the balance owed ($14,000,000) to lease the $200 Million Leased CD, and thus G.Y.S. was not eligible for a refund of G.Y.S.'s initial $622,500 investment.

27.     It was further part of the conspiracy that in early February 2010, JAIJAIRAM, at the direction of HERNANDEZ, e-mailed a cease and desist letter to G.Y.S. informing G.Y.S. that because G.Y.S. purportedly breached the UNISTATE leasing agreement, G.Y.S. was not permitted to access or otherwise use the $200 Million Leased CD.

28.     It was further part of the conspiracy that HOLLAND, ROSENFELD, HERNANDEZ, HEDRICK, JAIJAIRAM, and SMITH did not return the various victims' initial deposits (including the $622,500 provided by G.Y.S.) when the high yield investment CDs failed to materialize.   The minimum total amount of the initial

investments was $2,297,500 plus initial escrow fees.   The high yield investment CDs never paid returns.

29.      It was further part of the conspiracy that HOLLAND (via Vital Funds), ROSENFELD (via Aster Capital), and others known and unknown continued to solicit new investors to invest in similar permutations of the fictitious investments and operate in a similar manner as set forth: (1) knowing that the "investments" never materialized, (2) consistently failing to return the initial investment monies, (3) failing to deliver any returns on the investments, (4) failing to provide any true, verifiable investment instrument, including the leased CDs, to investors as promised.   The alleged conspiracy continued until in or about early 2010.

## OVERT ACTS

In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the Middle District of Florida and elsewhere:

**Deal Structurers $10 Million Leased CD and Proof of Funds Account**

1.      On or about June 17, 2009, D.J. and Deal Structurers wired an initial payment of $150,000 to Commercial Escrow Services.

2.      On or about June 18, 2009, Commercial Escrow Services disbursed (via wire transfer) the $150,000 as follows:   Vital Funds and HOLLAND Wells Fargo Bank Account ($61,825), Aster Capital and ROSENFELD BBVA Compass Bank Account ($61,825), and SMITH Regions Bank Account ($25,000). Commercial Escrow Services retained an escrow fee of $1,350.

**WCSP Country Club Plaza $4 Million Leased CD Investment**

3.      On or about September 25, 2009, $250,000 of J.N. and WCSP Country Club Office Plaza, LLC, funds were wire transferred from the Woodhaven National Bank Account of ACCP LP to the Commercial Escrow Services Union Bank Account.

4.      On or about September 28, 2009, $125,000 of J.N. and WCSP Country Club Office Plaza, LLC, funds were wire transferred from a BBVA Compass Bank Account to the Commercial Escrow Services Union Bank Account.

5.      On or about October 1, 2009, Commercial Escrow Services disbursed (via wire transfers) J.N. and WCSP Country Club Office Plaza, LLC's combined $375,000 as follows: Aster Capital and ROSENFELD BBVA Compass Bank Account ($204,756), and UNISTATE Citibank Espana, S.A. Bank Account ($168,394). Commercial Escrow Services retained an escrow fee of $1,850.

6.      On or about October 2, 2009, Aster Capital (ROSENFELD) wired $80,169 of the J.N. and WCSP Country Club Office Plaza, LLC funds from Aster Capital's BBVA Compass Bank Account to the Vital Funds (HOLLAND) Wells Fargo Bank Account.

**G.Y.S. $200 Million Leased CD Investment**

7.      On or about November 3, 2009, at the direction of HOLLAND, G.Y.S. wired $3,000 from G.Y.S.'s CNL Bank Account in Jacksonville, Florida to the Vital Funds (HOLLAND) Wells Fargo Bank Account, which was purportedly an escrow fee for the $200 Million Leased CD transaction.

8.      On or about November 3, 2009, SMITH, who was affiliated with Cole's Cash Flow Specialists, LLC, e-mailed G.Y.S. an Account Agreement and Escrow Agreement for G.Y.S. to execute, which provided for G.Y.S. to wire $622,500 to Commercial Escrow Services for the benefit of HOLLAND and Vital Funds.

9.      In early November 2009, G.Y.S. met with HEDRICK, who represented, among other things, that HEDRICK (a) had significant international banking relationships; (b) could "monetize" the high yield investment CD; (c) could place the high yield investment CD into platform trading; (d) worked with similar high yield bonds much larger than $200,000,000; (e) has seen such deals pay significant returns; and (f) expected significant returns once the high yield CD investment was monetized and invested into high level platform trading.

10.     On or about November 3, 2009, HEDRICK e-mailed G.Y.S. concerning G.Y.S.'s ability to purchase a purported international banking passport ("The Banking Passport"), its potential use, and the itemized cost to obtain the banking passport via HEDRICK, which was $28,289 and would purportedly assist G.Y.S. in effectively using the leased CD.

11.     On or about November 4, 2009, based upon the false and fraudulent representations of HOLLAND, HEDRICK, and SMITH, G.Y.S. wired $622,500 from a CNL Bank branch in the Middle District of Florida to a Union Bank account for Commercial Escrow Services located in California.

12.     On or about November 5, 2009, HEDRICK e-mailed G.Y.S. an

invoice and wiring instructions identifying the bank account for G.Y.S. to wire HEDRICK the $28,289 for The Banking Passport.

13.     On or about November 6, 2009, G.Y.S., at the direction of HEDRICK, wired $28,289 for The Banking Passport from G.Y.S.'s CNL Bank Account in Jacksonville, Florida to the Hedrick Consulting, Inc. (HEDRICK) First Citizens Bank Account.

14.     On or about November 9, 2009, G.Y.S., at the direction of HOLLAND, e-mailed HOLLAND executed UNISTATE contracts.

15.     On or about November 9, 2009, Commercial Escrow Services wired $201,431 to the Wells Fargo Bank account held by Vital Funds (HOLLAND).

16.     On or about November 9, 2009, Commercial Escrow Services wired $78,172 to a BBVA Compass account held by Aster Capital, Inc. (ROSENFELD).

17.     On or about November 11, 2009, a representative of Vital Funds, at the direction of HOLLAND, emailed G.Y.S. with information related to the purported $200 Million Leased CD, which included a fictitious CUSIP identifier and purported DTC protocols to access information related to the $200 Million Leased CD.

18.     On or about November 12, 2009, Vital Funds (HOLLAND), via the same Wells Fargo Bank account, wired $131,290 to a Regions Bank account held by SMITH.

19.     On or about November 13, 2009, SMITH wired $5,550 from SMITH's Regions Bank account to the SunTrust Bank account held by HEDRICK.

20.     On or about November 9, 2009, Commercial Escrow Services, via the Union Bank account, wired $339,502 to UNISTATE's Citibank Espana account (HERNANDEZ).

21.     On or about November 27, 2009, a total of approximately $152,159 was transferred into CJ Group Services' (JAIJAIRAM) Bank of America account, a portion of which came from the UNISTATE Citibank Espana Account.

22.     On or about November 9, 2009, three days before SMITH was paid with a portion of G.Y.S.'s $622,500, SMITH e-mailed GYS contracts for G.Y.S. to execute with UNISTATE (HERNANDEZ) concerning the leasing and use of the high yield investment CD.

23.     On or about November 9, 2009, HEDRICK executed the UNISTATE contract to purportedly further G.Y.S.'s investment into and use of the high yield investment CD, and sent the executed contract to HOLLAND at Vital Funds.

24.     On or about November 20, 2009, HEDRICK e-mailed G.Y.S. another rendition of the fictitious D.T.C. screen shot of the purported $200 Million Leased CD, which listed HEDRICK as the beneficiary of the CD.

25.     On or about December 1, 2009, HOLLAND of Vital Funds e-mailed the fictitious D.T.C. screen shot of the purported high yield investment CD to HEDRICK (copying G.Y.S.), which purportedly named HEDRICK as the beneficiary of the $200 Million Leased CD.

26.     On or about January 17, 2010, after G.Y.S. made repeated attempts to contact HOLLAND and HEDRICK concerning the leasing and use of the

purported high yield investment CD, HEDRICK e-mailed G.Y.S. (copying SMITH) concerning HEDRICK's purported ability to revive the investment and to "monetize" the $200 Million Leased CD, pay the required 7% lease fee ($14,000,000) to UNISTATE, and provide G.Y.S. options to use the $200 Million Leased CD, which would purportedly provide G.Y.S. the previously promised capital.

27.     On or about January 18, 2010, HOLLAND e-mailed G.Y.S. (copying HEDRICK) explaining, in substance, that, in addition to the previously achieved 30 day extension for the investment of the $200 Million Leased CD to cover the balance owed to further use the $200 Million Leased CD ($14,000,000), UNISTATE (HERNANDEZ and JAIJAIRAM) agreed to extend G.Y.S.'s access to and use of the $200 Million Leased CD for a period of one year from the time of the expected lease payment of the $14,000,000, and thus that HEDRICK would be able to further "monetize" the $200 Million Leased CD and continue efforts to use the $200 Million Leased CD to generate promised investment returns.

28.     On or about January 21, 2010, HOLLAND e-mailed G.Y.S. (copying HEDRICK) a "monetizing" contract and stated, in substance, that if G.Y.S. executed the contract, that cash would be available to G.Y.S., and that a net "payout" to G.Y.S. of $5,480,000 was expected in 5 to 10 banking days.

29.     On or about February 12, 2010, JAIJAIRAM, at the direction of HERNANDEZ, e-mailed a cease and desist letter to G.Y.S. informing G.Y.S. that because G.Y.S. purportedly breached the contract with UNISTATE (did not

21

provide the 7% fee ($14,000,000) to UNISTATE), G.Y.S. no longer had access to the $200 Million Leased CD.

30.     At no time did HOLLAND, ROSENFELD, HERNANDEZ, HEDRICK, JAIJAIRAM, or SMITH offer to refund G.Y.S. his $625,500 "investment."

31.     In or about early February 2010, HERNANDEZ told JAIJAIRAM that because of the work that HERNANDEZ, JAIJAIRAM, and others performed to secure the investment and attempt to place the $200 Million Leased CD investment, that all fees paid by G.Y.S. were deemed earned.

**B.W. $100 Million Leased CD**

32.     On or about November 17, 2009, B.W., at the direction of HOLLAND, facilitated the wiring of an initial payment of $300,000 from the RLK Investment Associates City National Bank Account to the Commercial Escrow Services Union Bank Account to further B.W.'s purported investment into the $100 Million Leased CD.

33.     On or about November 19, 2009, Commercial Escrow Services disbursed (via wire transfers) B.W.'s $300,000 as follows:   Vital Funds (HOLLAND) Wells Fargo Bank Account ($32,648), Aster Capital (ROSENFELD) BBVA Compass Bank Account ($92,647), and UNISTATE Citibank Espana Account ($172,005).   Commercial Escrow Services retained an escrow fee of $2,700.

**R.S. and Alpha, LLC $100 Million Leased CD**

34.     On or about November 17, 2009, R.S. and Alpha, LLC, via a Bancorp

22

South Bank Account, and at the direction of HOLLAND, facilitated the wiring of $400,000 to the Commercial Escrow Services Union Bank Account to further Alpha, LLC's purported investment into the $100 Million Leased CD.

35.    On or about November 19, 2009, Commercial Escrow Services disbursed (via wire transfers) Alpha, LLC's $400,000 as follows:   Vital Funds (HOLLAND) Wells Fargo Bank Account ($113,098), Aster Capital (ROSENFELD) BBVA Compass Bank Account ($113,097), and UNISTATE Citibank Espana Account ($172,005).   Commercial Escrow Services retained an escrow fee of $1,800.

### Aurora Asset Management, LLC $100 Million Leased CD

36.    On or about December 30, 2009, a representative of Aurora Asset Management, LLC, via a Bank of America Account, and at the direction of HOLLAND, facilitated the wiring of $450,000 to the Commercial Escrow Services Union bank Account to further Aurora's purported investment into the $100 Million Leased CD.

37.    On or about January 4, 2010, Commercial Escrow Services disbursed (via wire transfer) Aurora's $450,000 as follows:   Vital Funds (HOLLAND) Wells Fargo Bank Account ($149,391), Aster Capital (ROSENFELD) BBVA Compass Bank Account ($131,890), and UNISTATE Citibank Espana Account ($165,669).   Commercial Escrow Services retained an escrow fee of $3,050.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH SEVENTEEN
## (WIRE FRAUD AND AIDING AND ABETTING WIRE FRAUD)

### A. SCHEME AND ARTIFICE

Between in or about early November 2009, and in or about February 2010, in the

Middle District of Florida, and elsewhere,

MITCHELL HOLLAND,
WARREN ROSENFELD,
JUAN LUIS HERNANDEZ RILL,
RONDELL SCOTT HEDRICK,

the defendants herein, did knowingly and willfully devise, intend to devise, and aid and

abet a scheme and artifice to defraud, and for obtaining money by means of materially

false and fraudulent pretenses, representations and promises.

### B. MANNER AND MEANS

The allegations in the Manner and Means Section set forth in Count One (the

Conspiracy to Commit Wire Fraud Count) are incorporated herein.

### C. EXECUTION

On or about the dates set forth below in each count, at Jacksonville, in the Middle

District of Florida, and elsewhere, for the purpose of executing the aforementioned

scheme and artifice to defraud and for obtaining money by false and fraudulent

pretenses, representations and promises, and attempting to do so, the defendants,

MITCHELL HOLLAND,
WARREN ROSENFELD,
JUAN LUIS HERNANDEZ RILL,
RONDELL SCOTT HEDRICK,

did knowingly transmit, cause to be transmitted, and aid and abet the transmission in

interstate and foreign commerce, by means of a wire communication, certain e-mail

communications and wire transfers in furtherance of the alleged scheme and artifice, as set forth by defendant below:

| Count | Defendant(s) | Date | Description | From | To | Violation |
|-------|--------------|------|-------------|------|-----|-----------|
| 2 | MITCHELL HOLLAND | 11/3/09 | Wire Transfer of $3,000 | CNL Bank – Jacksonville, FL – G.Y.S. Account | Wells Fargo Bank – California Vital Funds Account | 18 U.S.C. § 1343 |
| 3 | MITCHELL HOLLAND WARREN ROSENFELD RONDELL SCOTT HEDRICK | 11/4/09 | Wire Transfer of $622,500 | CNL Bank – Jacksonville, FL – G.Y.S. Account | Union Bank – California Commercial Escrow Services Account | 18 U.S.C §§ 1343 and 2 |
| 4 | MITCHELL HOLLAND WARREN ROSENFELD RONDELL SCOTT HEDRICK | 11/4/09 | E-mail from G.Y.S. to HOLLAND at approximately 9:00 pm attaching beneficiary designation as HEDRICK (then forwarded to ROSENFELD) | G.Y.S. | HOLLAND | 18 U.S.C. §§ 1343 and 2 |
| 5 | MITCHELL HOLLAND | 11/9/09 | E-mail from G.Y.S. to HOLLAND at 3:31 pm containing executed UNISTATE contracts | G.Y.S. | HOLLAND | 18 U.S.C. § 1343 |

| Count | Defendant(s) | Date | Description | From | To | Violation |
|---|---|---|---|---|---|---|
| 6 | MITCHELL HOLLAND | 12/1/09 | E-mail from HOLLAND to HEDRICK at 3:10 pm containing the D.T.C. screen shot of a $200 million CD (G.Y.S. CD) and copying G.Y.S. | HOLLAND | HEDRICK (copying G.Y.S.) | 18 U.S.C. § 1343 |
| 7 | MITCHELL HOLLAND RONDELL SCOTT HEDRICK | 1/21/10 | E-mail from HOLLAND to G.Y.S. (copying HEDRICK) at 11:00 pm containing a "Monetization of Instrument" Agreement, D.T.C. Screen shot, and a Computation of Return listing G.Y.S.'s return on investment as 5510% | HOLLAND | G.Y.S. | 18 U.S.C. § 1343 |
| 8 | MITCHELL HOLLAND | 1/28/10 | E-mail from HOLLAND to G.Y.S. (copying HEDRICK) at 2:58 am containing a revised D.T.C. screen shot of the $200 Million CD | HOLLAND | G.Y.S. | 18 U.S.C. § 1343 |

26

| Count | Defendant(s) | Date | Description | From | To | Violation |
|---|---|---|---|---|---|---|
| 9 | MITCHELL HOLLAND WARREN ROSENFELD | 2/25/10 | E-mail from HOLLAND to G.Y.S. providing ROSENFELD response to G.Y.S. as to G.Y.S. requesting a refund and also being in default for $14,000,000 | HOLLAND (copying ROSENFELD response) | G.Y.S. | 18 U.S.C. §§ 1343 and 2 |
| 10 | JUAN LUIS HERNANDEZ RILL | 1/13/10 | E-mail from JAIJAIRAM to G.Y.S. at the direction of HERNANDEZ informing G.Y.S. of the purported 30 day extension to access the $200 Million Leased CD | JAIJAIRAM (at direction of HERNANDEZ) | G.Y.S. | 18 U.S.C. §§ 1343 and 2 |
| 11 | JUAN LUIS HERNANDEZ RILL | 2/12/10 | E-mail from JAIJAIRAM to G.Y.S. at 11:01 am at the direction of HERNANDEZ attaching the cease and desist letter to G.Y.S. | JAIJAIRAM (at direction of HERNANDEZ) | G.Y.S. | 18 U.S.C. §§ 1343 and 2 |
| 12 | RONDELL SCOTT HEDRICK | 11/3/09 | E-mail from HEDRICK to G.Y.S. at 9:53 pm concerning The Banking Passport, its use, and itemized cost | HEDRICK | G.Y.S. | 18 U.S.C. § 1343 |

| Count | Defendant(s) | Date | Description | From | To | Violation |
|-------|--------------|------|-------------|------|-----|-----------|
| 13 | RONDELL SCOTT HEDRICK | 11/5/09 | E-mail from HEDRICK to G.Y.S. at 2:34 pm concerning an invoice for The Banking Passport and wiring instructions identifying the bank account for G.Y.S. to wire HEDRICK $28,289 | HEDRICK | G.Y.S. | 18 U.S.C. § 1343 |
| 14 | RONDELL SCOTT HEDRICK | 11/6/09 | Wire Transfer of $28,289 for The Banking Passport | CNL Bank – Jacksonville, FL – G.Y.S. Account | First Citizens Bank – North Carolina – Hedrick Consulting, Inc. Account | 18 U.S.C. § 1343 |
| 15 | RONDELL SCOTT HEDRICK | 11/20/09 | E-mail from HEDRICK to G.Y.S. at 6:37 pm attaching a D.T.C. screen shot of the $200 million leased CD | HEDRICK | G.Y.S. | 18 U.S.C. § 1343 |
| 16 | RONDELL SCOTT HEDRICK | 1/17/10 | E-mail from HEDRICK to G.Y.S. (copying SMITH) at 10:09 pm concerning HEDRICK's ability to lease and use the $200 Million CD and pay all required fees | HEDRICK | G.Y.S. | 18 U.S.C. § 1343 |

| Count | Defendant(s) | Date | Description | From | To | Violation |
|-------|-------------|------|-------------|------|-----|-----------|
| 17 | RONDELL SCOTT HEDRICK | 2/01/10 | E-mail from HEDRICK to G.Y.S. regarding HEDRICK's response to G.Y.S. voicemail and placement of funds to secure the $200 Million Leased CD | HEDRICK | G.Y.S. | 18 U.S.C. § 1343 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## FORFEITURE

1.      The allegations contained in Counts 1 through 17 of this Indictment are incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.      Upon conviction of a violation of Title 18, United States Code, Sections 1349 and 1343, MITCHELL HOLLAND, WARREN ROSENFELD, JUAN LUIS HERNANDEZ RILL, and RONDELL SCOTT HEDRICK shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

3.      The property to be forfeited includes, but is not limited to, the following:

> A sum of money equal to $9,151,978.00 in United States currency, representing the amount of proceeds obtained as a result of the offenses, 18 U.S.C. §§ 1349 and 1343.

4.      If any of the property described above, as a result of any act or omission of each defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty,

30

the United States of America shall be entitled to forfeiture of substitute property

pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title

28, United States Code, Section 2461(c).

A TRUE BILL,

Foreperson

A. LEE BENTLEY, III
United States Attorney

By: _____
A. TYSEN DUVA
Assistant United States Attorney

By: _____
KAREN L. GABLE
Assistant United States Attorney
Chief, Criminal Division (North)

31

## UNITED STATES DISTRICT COURT
### Middle District of Florida
### Jacksonville Division

### THE UNITED STATES OF AMERICA

vs.

MITCHELL HOLLAND,
WARREN ROSENFELD,
JUAN LUIS HERNANDEZ RILL,
RONDELL SCOTT HEDRICK

## INDICTMENT

Violations:

| | |
|---|---|
| Ct. 1: | 18 U.S.C. §§ 1349 & 1343 |
| Cts. 2-17: | 18 U.S.C. §§ 1343 & 2 |

A true bill,

_____
Foreperson

Filed in open court this 17th day
of April, 2014.

_____, Deputy Clerk
Clerk

Bail   $_____

GPO 863 525