1                    IN THE UNITED STATES DISTRICT COURT
                        MIDDLE DISTRICT OF FLORIDA
2                          JACKSONVILLE DIVISION

3   UNITED STATES OF AMERICA,          Jacksonville, Florida

4               Plaintiff,             Case No. 3:14-cr-73-MJG-JRK

5   -vs-                               Thursday, April 23, 2015

6   WARREN ROSENFELD,                  10:53 a.m.

7               Defendant.             Courtroom 12A
    _____
8

9                        **EXCERPT OF JURY TRIAL**
                **(EXCERPTS OF WARREN ROSENFELD'S TESTIMONY)**
10              BEFORE THE HONORABLE MARVIN J. GARBIS
                    UNITED STATES DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20

21
    OFFICIAL COURT REPORTER:
22
            Shelli Kozachenko, RPR, CRR
23          221 N. Hogan Street, #185
            Jacksonville, FL  32202
24          Telephone:  (904) 301-6842

25                        (Proceedings reported by stenography;
                            transcript produced by computer.)

1                    <u>A P P E A R A N C E S</u>

2

COUNSEL FOR GOVERNMENT:

3

          **Tysen Duva, Esquire**
4         United States Attorney's Office
          300 North Hogan Street, Suite 700
5         Jacksonville, FL  32202

6

7 COUNSEL FOR DEFENDANT:

8         **Mitchell Stone, Esquire**
          Stone Lockett
9         1540 The Greens Way
          Jacksonville Beach, FL  32250
10

11

COUNSEL FOR CODEFENDANT HOLLAND:
12

          **Paul Shorstein, Esquire**
13        Shorstein & Lasnetski, LLC
          6550 St. Augustine Road, Suite 303
14        Jacksonville, FL  32217

15

16 COUNSEL FOR CODEFENDANT HEDRICK:

17        **Maurice Grant, Esquire**
          Federal Defender's Office
18        200 West Forsyth Street, Suite 1240
          Jacksonville, FL  32202
19

20

21

22

23

24

25

# T A B L E   O F   C O N T E N T S

**DEFENDANT ROSENFELD'S WITNESS:**                    **Page No.**

   **WARREN ELLIOT ROSENFELD**

      PARTIAL DIRECT EXAMINATION BY MR. STONE......    4

      CROSS-EXAMINATION BY MR. DUVA...............    8

      REDIRECT EXAMINATION BY MR. STONE...........   78

1                          P R O C E E D I N G S

2     Thursday, April 23, 2015                        10:53 a.m.

3                          *   *   *   *   *

4           COURTROOM DEPUTY:  Sir, can you raise your right

5     hand, please?

6           Do you solemnly swear or affirm that the testimony

7     you're about to give before this Court will be the truth, the

8     whole truth, and nothing but the truth, so help you God?

9           THE WITNESS:  I do.

10          COURTROOM DEPUTY:  Please be seated.

11          Can you state your full name for the record and spell

12    your last name?

13          THE WITNESS:  It's Warren Elliot Rosenfeld,

14    R-o-s-e-n-f-e-l-d.

15          COURTROOM DEPUTY:  Thank you.

16     WARREN ELLIOT ROSENFELD, DEFENDANT ROSENFELD'S WITNESS, SWORN

17                        DIRECT EXAMINATION

18    BY MR. STONE:

19    Q.   And good morning, Mr. Rosenfeld.

20          Can you please tell us a little bit about yourself,

21    your date of birth, age, residence, whether you're married,

22    your education?

23    A.   Yes.  I was born 6/23/54.  I live in Plano, Texas, which

24    is a suburb of Dallas.  I'm married to my wife, Shaun.

25                          *   *   *   *   *

1  BY MR. STONE:

2  Q.   Okay.  Let me ask you a question concerning your

3  business practice in the -- in this arena.

4        Have you been in -- have you been involved in any

5  deals that ultimately there was something revealed that

6  demonstrated that the deal was not good?

7  A.   Yes.

8  Q.   Okay.  Can you tell us about an example of that?

9  A.   Yeah.  In approximately -- I'd have to look for the exact

10  dates -- late 2008, perhaps December, but late 2008, I was

11  contacted by a Secret Service agent that was looking for expert

12  witnesses in the area that I was --

13        MR. DUVA:  Objection.  May we approach, Your Honor?

14        THE COURT:  Yes, of course.

15     (At sidebar, out of the hearing of the jury:)

16        MR. DUVA:  I'm going to make an objection on

17  relevance and also that this was never disclosed.

18        THE COURT:  I'll sustain it.

19        Go to another subject.

20        MR. STONE:  Your Honor --

21        THE COURT:  Go to another subject.  2008.  You're not

22  going to bolster his reputation.

23        MR. STONE:  Your Honor, this goes directly to a deal

24  that Mr. Duva has presented to us.

25        THE COURT:  Oh.

1        Well, Mr. Duva, Mr. Stone says this is a transaction

2    that you brought into the case.

3            MR. DUVA:  Which is which one?

4            MR. STONE:  Symtech.

5            MR. DUVA:  I've never heard anything about this.

6            THE COURT:  Well, okay, but it's about Symtech so he

7    can ask the question.

8            MR. DUVA:  Okay.

9        (End of discussion at sidebar.)

10   BY MR. STONE:

11   Q.    So were you -- did you receive contact about something?

12   A.    Yes.

13   Q.    And what was that?

14   A.    They were trying to find people in the industry who had

15   some knowledge that could explain how the business worked.

16   Q.    Okay.  And did you develop a -- at least an acquaintance

17   or relationship with a particular agent?

18   A.    It was a brief acquaintance based on the discussions

19   regarding that subject.

20   Q.    And there was a -- there was a transaction or deal that

21   the government presented to the jury in this trial, and there

22   was a -- a document presented that was alleged to be fraud

23   about a Chase account, correct?

24   A.    That's correct.

25   Q.    And can you tell the jury about that?

1  A.   Yes.  As part of our conversation that had nothing to do

2  with that account or that letter, at the end of it -- the

3  agent's name was Mike Purcell.  The agent --

4  Q.   Can you move up?  I can't hear you.

5  A.   The agent said, "Thanks for your help.  You were very

6  informative.  Can I call you back if I need to have any more

7  questions?"

8         I said, "Sure."

9         After we got done, I thought about a transaction I

10  was recently involved in, within the last 30 days.  And the

11  more I thought about it, the more I thought that it fit the

12  type of investigation he was involved in.

13        So I called him back and I said, "You know, we had a

14  customer, and we were given a bank letter that we found out

15  didn't look right."

16        So our immediate reaction was to go to the supplier,

17  who was actually Real Gallant's supplier, and the name of that

18  supplier was Apogee.  And we said, "Why is there a problem?"

19        And then they gave an explanation that sounded

20  plausible, but our position was, "We don't want to hear any

21  explanations.  We want you to refund the customer's money."

22  And they did.

23  Q.   Was the customer's money already out of escrow?

24  A.   It was out of escrow.  It was in Apogee's hands.  It

25  wasn't even in our hands.

1   Q.   What about your -- what about the fee you had earned?

2   A.   I had my fee.

3   Q.   Okay.  And so what, if anything, was done with the

4   money?

5   A.   All of the money, including Apogee's money, was returned

6   to the customer.

7   Q.   Why?

8   A.   Because they were not satisfied with the results that they

9   got when they used the proof of funds letter.

10  Q.   Okay.  And so did you do anything with that proof of

11  funds letter that was the basis of your concern?

12  A.   Yes.  I turned that over to the Secret Service and said,

13  "Listen, here's something I know about.  I think it might be

14  something you might want to follow up and investigate."

15  Q.   And is that the same letter that we saw here?

16  A.   Yes.

17                         *   *   *   *   *

18          THE COURT:  Mr. Duva?

19          MR. DUVA:  Yes, sir.

20                      CROSS-EXAMINATION

21  BY MR. DUVA:

22  Q.   Mr. Rosenfeld, what is a con man?

23  A.   Excuse me?

24  Q.   You heard me.

25  A.   No, I did not, sir.

```
 1   Q.    What is a con man?

 2   A.    A con man?

 3             MR. STONE:  Objection, Your Honor.  This is not

 4   proper.

 5             THE COURT:  Overruled.

 6             THE WITNESS:  A con man, I would -- by my definition

 7   would be someone that tells a lie.

 8   BY MR. DUVA:

 9   Q.    No.  It would be somebody who instills confidence in a

10   group of people based on a set of facts, right?

11   A.    My answer stands.

12   Q.    But my description's a little bit more accurate?

13             THE COURT:  I think I have to sustain the objection.

14   It's an argument rather than a question.

15   BY MR. DUVA:

16   Q.    Are you a con man?

17   A.    No.

18             MR. STONE:  Objection, Your Honor.

19   BY MR. DUVA:

20   Q.    All right.  Let's look at 10A.

21             We're going to get to the Symtech deal.  Is that

22   the one where you were approached by the Secret Service agent

23   Mike Purcell and asked to be an expert witness?

24   A.    No.

25   Q.    Which one was that?
```

```
 1    A.    I'd have to look it up.

 2    Q.    You can't recall?

 3    A.    I'd have to look it up.  I don't recall it.

 4    Q.    That's a pretty big event, I mean, you being offered by

 5    the law enforcement community to be an expert witness?

 6    A.    (Nods head up and down.)

 7    Q.    You can't nod.  You have to say yes or no.

 8    A.    Yes, that was a big event.

 9    Q.    Did you ever get hired?

10    A.    I was brought in as a material witness.

11    Q.    Did you get paid?

12    A.    No.

13    Q.    Where did you testify?

14    A.    In I think it was Queens.

15    Q.    Federal court, state court?

16    A.    Federal.

17    Q.    What court?

18    A.    I don't recall the court.

19    Q.    You don't recall the district?

20    A.    I do -- well, the district?  I think it was the Eastern

21    District of New York in Queens.  I'm not sure.

22    Q.    And other than that, have you ever testified in federal

23    court?

24    A.    Yes.

25    Q.    Besides today?
```

1    A.    Yes.

2    Q.    When?

3    A.    Grand jury testimony to you.

4    Q.    Okay.  I meant here in federal court, in a courtroom

5    like this.

6    A.    No.

7    Q.    Okay.  So what is a material witness?

8    A.    A material witness, by my definition, is someone who can

9    communicate facts that they have knowledge of.

10   Q.    Okay.  So you mean a lay witness.

11   A.    If that's the legal term, I'll defer to your terminology.

12   Q.    And there's expert witnesses and lay witnesses?

13   A.    Again, you're asking me legal terms I can't define.

14   Q.    And you don't have an expert witness, right?

15   A.    An expert witness for what?

16   Q.    For this trial.

17              MR. STONE:  Objection, Your Honor.  That's improper.

18              THE COURT:  Sustained.  In fact, he has nothing to do

19   with who gets called.

20              Another question, Mr. Duva.

21   BY MR. DUVA:

22   Q.    Did you hire one?

23              MR. STONE:  Objection, Your Honor.

24              THE COURT:  Sustained.  That's part --

25              MR. STONE:  May we approach?

1    THE COURT:  You don't have to approach.  It's not

2  relevant.

3    Mr. Duva, ask him about other things.

4  BY MR. DUVA:

5  Q.    Okay.  On the -- we'll call it the Symtech deal, I

6  believe it was March 17th, 2008.  Those are your escrow

7  instructions?

8  A.    Yes.

9  Q.    And those are substantially the same as the other escrow

10  instructions that were in the Unistate deals, right?

11  A.    They are generally the same instructions.

12  Q.    All right.  Let's look at the principal/sub account

13  agreement.

14  A.    And where is that?

15  Q.    It is coming up.

16    Do you want the physical paper?  I can give you

17  that.

18  A.    Okay.

19  Q.    So this is the sub account agreement?

20  A.    Correct.

21  Q.    You prepared it?

22  A.    Yes.

23  Q.    And the progression of it is it's much the same as the

24  Vital Funds agreements, right?

25  A.    It has the same general concepts and conditions.

1  Q.   Okay.  Like a hundred million dollar account.

2  A.   Well, that's the value of the account specified in the

3  agreement.

4  Q.   And that was sort of generally the numbers that we're

5  dealing with.  I mean, there were some differences, but it

6  was 100 million, 200 million, and the like.

7  A.   Well, we -- we assign the value to each account according

8  to the request of the client.

9  Q.   And it was always 100 million or 200 million?

10  A.   It was of all different amounts.  I've done amounts down

11  to $100,000 and up to $500 million.

12  Q.   Anything in the billions?

13  A.   I've never done a billion dollar account, no.

14  Q.   So this had an arrangement fee in the payment section of

15  650,000?

16  A.   In the -- oh, yes.  Correct.

17  Q.   And then another 650,000 fee for each additional period

18  of time?

19  A.   Yes.

20  Q.   Okay.  And it was signed by you, right, on page 2?

21  A.   Yes.

22  Q.   And Ted Sweeten?

23  A.   Yes.

24  Q.   Did you ever -- did you research anything about

25  Mr. Sweeten?

1   A.    I did not.

2   Q.    You haven't done it recently?

3   A.    No.

4   Q.    You didn't know he was a convicted felon?

5   A.    No.

6         MR. STONE:  Objection, Your Honor.

7   BY MR. DUVA:

8   Q.   Okay.  All right.  Let's look at 10B.

9        So this is an e-mail at the top from Dr. Mitchell

10  Holland?

11  A.    Yes.

12  Q.    And he's sending that to Ms. Hardstone?

13  A.    Correct.

14  Q.    And this is for the release of the Symtech escrow

15  amounts, correct?

16  A.    Correct.

17  Q.    Okay.  And there was some issue with this deal, correct?

18  A.    There was.

19  Q.    And then you -- on 10E --

20         MR. DUVA:  Blow up 10E.  You have it there.

21  BY MR. DUVA:

22  Q.   You did a general release with the Saint Juste

23  Corporation?

24  A.    Correct.

25  Q.   That's Mark Saint Juste?

1    A.    Correct.

2    Q.    Do you know him?

3    A.    I know who he is.  I have --

4    Q.    Ever laid eyes on him though?

5    A.    No.

6    Q.    And for this you were releasing this contract to him for

7    a $10,000 fee.

8    A.    I received a $10,000 fee.  I can't tell you the exact

9    consideration of it.

10   Q.    Well, do you want to read it out loud?

11   A.    Sure.

12   Q.    I mean, in essence you're giving him the rights to that

13   agreement for $10,000.

14   A.    That's correct.

15   Q.    Did you get it?  Did you get the money?

16   A.    I'd have to look at my records.

17   Q.    Do you know whether this deal closed --

18   A.    I do not.

19   Q.    -- with Mr. Saint Juste?

20   A.    I do not.

21   Q.    Okay.  Look at 11A.  That's the MagMetal deal.

22   A.    Okay.

23   Q.    Now, this is an almost verbatim, with some word

24   differences, rendition of the Vital Funds agreement, correct?

25   A.    Correct.

1  Q.   All right.  If we looked at that next to, let's say, 3D,

2  the Sayar account agreement, I mean, the wording is almost

3  exact.

4  A.   Yeah.  The wording is extremely similar, only subject to

5  the slight differences required for each individual account

6  circumstance.

7  Q.   So this deal is -- the fee is 475,000?

8        MR. DUVA:  And I think that's in addendum 1.  It's

9  two pages over.

10        THE WITNESS:  Yes.

11  BY MR. DUVA:

12  Q.   And then a $225,000 fee for each additional 30-day term?

13  A.   Correct.

14  Q.   All right.

15        MR. DUVA:  Go to 11C.

16  BY MR. DUVA:

17  Q.   Did this deal pay out ultimately?

18  A.   Is this MagMetal?

19  Q.   Yeah.

20  A.   Yes.

21  Q.   It did?

22  A.   Yes.

23  Q.   Okay.

24        MR. DUVA:  Go to 11C.

25  BY MR. DUVA:

1  Q.   Now, that's the proof of funds letter for MagMetal dated

2  July 21st, 2008?

3  A.   Uh-huh.

4  Q.   Sir, you've got to say yes or no.

5  A.   Yes.

6  Q.   Okay.  All right.  So the proof of funds letter, I mean,

7  you're -- did you know at the time this was a fake document?

8  A.   No.

9  Q.   Learn that in the trial?

10  A.   I heard testimony in the trial that it was.

11  Q.   But you weren't convinced?

12  A.   I had no reason to disbelieve the witness.

13  Q.   Now, there was a lot of questioning of that witness

14  about did you check this database or did you check that one.

15          Were you satisfied with the answers?

16  A.   I was satisfied with all his answers.

17  Q.   Okay.  All right.  So in a deal that you're involved in

18  July 21, 2008, you've got a fake proof of funds document.

19  A.   I don't know that.

20  Q.   But you have no reason to -- you have no other evidence

21  other than what Mr. Oleg Khanyutin testified to in court,

22  correct?

23  A.   In court this week?

24  Q.   Right.

25  A.   That's correct.

1   Q.   All right.  So -- and that's in July 2008?

2   A.   Yes.

3   Q.   And that's the same year that the Secret Service

4   approached you about being a material witness in court about

5   another fake document in a different deal that you were

6   involved in?

7   A.   No.  No.  He didn't -- they didn't approach me about being

8   a material witness in a -- in an account I was involved in.

9   Q.   Oh, it was some other account?

10  A.   It was some other account.

11  Q.   Okay.  But then you relayed one of your recent

12  experiences?

13  A.   Correct.

14  Q.   All right.  And in this case, Unistate was not involved

15  in the MagMetal deal.

16  A.   Correct.

17          MR. DUVA:  Let's look at 11D.

18          Page 2.

19  BY MR. DUVA:

20  Q.   When you say it paid out, you mean because you got

21  $123,050.

22  A.   Correct.

23  Q.   Saint Juste got 350,000?

24  A.   Correct.

25  Q.   And that's the same guy that you sold the rights to for

1   the Symtech deal?

2   A.    That's the same gentleman.

3   Q.    Same guy you've never met?

4   A.    Same -- yeah, it's the same gentleman.

5   Q.    But you never met him?

6   A.    No, I never met him.

7   Q.    All right.  So then your rendition of it paying out was

8   you got $123,050, right?

9   A.    That I -- that I got before I paid the brokers.

10  Q.    Okay.  What was your profit?

11  A.    I'd have to look in the records that I sent you when I was

12  subpoenaed to see what brokers I had to pay.

13  Q.    Okay.  Well, we'll look at 11F.

14  A.    I know there were two brokers paid on this deal.  I don't

15  remember what I paid them.

16  Q.    We'll look at 11F, okay?  Maybe that will refresh your

17  memory.

18          So the disbursement to Commercial Escrow Services

19  on June 3rd, 2008, there at the top was $475,000 by MagMetal?

20  A.    Correct.

21  Q.    So this contract is essentially the same as the account

22  agreements with the Vital Funds insignia on it, correct, that

23  we just looked at?

24  A.    The general gist of them.

25  Q.    Okay.  I mean, the wording -- and the jury can compare

1  them side by side.  We won't do that here right now and waste

2  time --

3          MR. STONE:  Objection.  Your Honor, I'm going to

4  object to asked and answered.  How many times does he have to

5  answer the same question?

6          THE COURT:  Overruled.

7  BY MR. DUVA:

8  Q.    But the one we looked at for MagMetal had the Aster

9  Capital insignia on it, correct?

10 A.    For MagMetal?

11 Q.    Yes.

12 A.    Yes.

13 Q.    Okay.  And so here it's the -- generally, whatever you

14 call it, proof of funds, sub account, CD, I mean, it's the

15 same type of transaction, essentially, that's explained in

16 the account agreement.

17 A.    No.  That's where the differences in the agreements are is

18 the structure of the financial instrument or account are

19 different, and that's what you need to change and specify in

20 the agreements.

21 Q.    So it's a matter of a few words in the warranties

22 section and the preamble and the addendum, right?

23 A.    Define a few words.

24 Q.    Probably less than 30?

25 A.    Yes, I would agree with that.

1  Q.   Okay.  So the MagMetal deal, the amount going to

2  Commercial Escrow Services is 475,000, right?

3  A.   Right.

4  Q.   And your cut is -- from Commercial Escrow Services on

5  July 24, 2008, is $123,050.

6  A.   Before payment of other brokers.

7  Q.   We're getting there.

8       And so then you sent $40,416 to Seasoned Funds.

9  A.   Okay.

10  Q.   And that's Mr. Holland.

11  A.   Correct.

12  Q.   And you sent additional money, the 25,000, to UFM

13  Commercial, LLC.

14  A.   Correct.

15  Q.   And that's it, right?

16  A.   That's it.

17  Q.   You got about 60,000?

18  A.   I'd have to do the math.

19  Q.   Okay.  So that's -- that deal, that's fake bank document

20  No. 1, the HSBC document, right?

21  A.   As of this week it appears to be a fake document.

22  Q.   As of this week.  Okay.

23       MR. DUVA:  Let's look at 19A.

24  BY MR. DUVA:

25  Q.   That's the Superstition Funding deal?

1   A.    Yes.

2   Q.    September 30, 2008?

3   A.    Yes.

4   Q.    What is that deal?

5         Look at page 5, I believe it is.  That's the

6   principal account agreement.

7   A.   Well, actually, these are the operational provisions of

8   the escrow.

9   Q.   I'm sorry.  We're getting there.

10        MR. DUVA:  Two over, I believe.

11        There you go.

12  BY MR. DUVA:

13  Q.   That's the principal and account agreement?

14  A.   Yeah.  I think Superstition Funding was the one that I

15  turned over to the Secret Service.

16  Q.   There is a --

17  A.   I can't swear to that.  I'd have to look it up, but I

18  believe it's --

19  Q.   Is that a --

20  A.   I believe it's this one.

21  Q.   Is that a $3 million deal?

22  A.   For the size of the account?

23  Q.   Right.

24  A.   Yes.

25  Q.   And you drafted this account agreement, correct?  I

1    mean, that's your company, Aster Capital?

2    A.    That's correct.

3    Q.    And the address there, is that a UPS Store on Preston

4    Road?

5    A.    Yes, it is.

6    Q.    So the warranty or the initial fee that you took in was

7    how much?

8    A.    $82,500.

9    Q.    And how much thereafter for each additional period of

10   time?

11   A.    Nothing.  These funds were refunded.

12   Q.    Well --

13   A.    $82,500 was refunded to the client.

14   Q.    Well, what does the contract call for?

15   A.    Well, the contract, if he wanted to renew the account,

16   would have been $52,500.

17   Q.    For each additional term?

18   A.    For each additional term as defined in the agreement.

19   Q.    And 19B, that's the JP Morgan Chase letter, right?

20   A.    I can't read it.

21          MR. DUVA:  Page 2.

22          THE WITNESS:  Yes.  I believe this is the letter I

23   turned over to the Secret Service.

24   BY MR. DUVA:

25   Q.    Before you did that, you sent it to Toni Hardstone on

1    October 7th, 2008?  That's the e-mail on the prior page?

2    A.    That's correct.

3    Q.    Okay.  And you heard Michael Thompson testify that this

4    is not an authentic document as far as JP Morgan Chase is

5    concerned.

6    A.    Correct, which I determined myself later and turned it

7    over to the Secret Service.

8    Q.    On October 6th, on 19C, you received $70,005 of the

9    $82,500?

10   A.    Correct.

11   Q.    Is that Apogee you're talking about that got 12,000?

12   A.    That's correct.

13   Q.    You provided all that money back?

14   A.    Yes.

15   Q.    Okay.  So that's -- you're aware, then, in these types

16   of transactions, whether it's a CD, sub account, proof of

17   funds, verification of deposit -- by this point you're aware

18   that, I mean, these fake bank documents are out there.

19   A.    I'm aware that there's -- that there's fraud in every

20   single financial transaction and company in the United States.

21   Q.    Including this one.

22   A.    Including JP Morgan Chase, including Bank of America,

23   including Citibank, within the bank.

24   Q.    But including these leased instruments.

25   A.    Yes.  I'm aware that they are in the same category as

```
 1  every other fraud category in the United States.
 2  Q.   I don't think we ever got to this on direct, but do you
 3  believe the Unistate deal itself was a scam?
 4  A.   After evidence I've seen in this trial, I believe there's
 5  reason to believe that there was a scam going on from Unistate.
 6  Q.   So you're the second person that learned that during
 7  this trial?  Mr. Hedrick and now you?
 8  A.   I don't know who else learned it in this trial.
 9  Q.   Well, you were sitting here when Mr. Hedrick testified
10  yesterday, right?
11  A.   I don't know who else learned it in this trial.
12  Q.   Well, what I'm asking you is, were you sitting in court
13  when he testified?
14  A.   When Mr. Hedrick testified?
15  Q.   Yes.
16  A.   Yes, I was.
17  Q.   And you heard him say that, correct?
18  A.   I heard him say that.
19  Q.   Okay.
20          MR. DUVA:  Now, let's go to 1F.
21  BY MR. DUVA:
22  Q.   So you prepared that document.
23  A.   Yes.
24  Q.   And that's -- essentially you used the prior Aster
25  Capital documents as what I would call a pony, you know, to
```

1    go by.

2    A.    I would call it a template.  Just as all commercial

3    companies use documents as templates, so do I.

4    Q.    Now, are there any exhibits admitted to this trial that

5    say that Tameka Shell was part of Unistate?

6    A.    I don't know.

7    Q.    I don't think so would be the better answer, right?

8    A.    My answer is I don't know.

9              MR. STONE:  He gave an answer.

10   BY MR. DUVA:

11   Q.    But, I mean, that was the suggestion by your lawyer to

12   some of the witnesses, correct?

13   A.    I mean, I don't know the answer to your question.  Do you

14   have another question?

15   Q.    I asked you, that was more of a suggestion by your

16   lawyer to some of the witnesses, that Tameka Shell was with

17   Unistate.

18   A.    I -- I don't know if he suggested that or not.

19   Q.    Now, in fact, Mr. Jenkins testified that Tameka Shell

20   was in some sort of partnership or something with

21   Mr. Holland, correct?

22   A.    Would you repeat the question?

23   Q.    Mr. Jenkins, DealStructurer, first witness of the trial,

24   testified that Tameka Shell, in fact, had some relationship

25   or partnership with Mr. Holland, correct?

1   A.    Correct, which is as I testified.

2   Q.    All right.  Look at the -- that's the account agreement.

3   That's the second of the DealStructurer deals, right, the

4   $600,000 payment for the $20 million blocked funds account?

5   A.    Yes.

6   Q.    Look at --

7         MR. DUVA:  Let's go with 1I.

8   BY MR. DUVA:

9   Q.    Now, that's the e-mail from Dr. Holland to Dwight

10  Jenkins about the $20 million and how it's moving, correct?

11  A.    It appears to be.  I have no --

12  Q.    And the next page is the blocked funds letter, right?

13  A.    It appears to be.

14  Q.    Okay.  So this is -- you heard the testimony of Catalino

15  Tovar from El Salvador.  He was the gentleman that, which was

16  refreshing, he was happy to be in America.

17  A.    Yes.

18  Q.    Okay.  So this is fake bank document No. 3, correct,

19  just that we've covered today?

20  A.    According to the testimony in court, yes.

21  Q.    Okay.  And you got paid well on the $600,000 blocked

22  funds deal, correct?

23  A.    I did.

24  Q.    You drafted a contract, correct?

25  A.    Yes.

```
 1              MR. DUVA:  Go to 1O.

 2    BY MR. DUVA:

 3    Q.   Per the wiring instructions that you sent the next day

 4    to Ms. Hardstone, you got $108,050, right?

 5    A.   That's correct.

 6    Q.   Mitchell Holland got the same.

 7    A.   Correct.

 8    Q.   And Rio Doce and Rock Financial got the rest.

 9    A.   Correct.

10    Q.   So no Tameka Shell in that one, right?

11    A.   She was not part of Rock Financial.

12    Q.   Okay.  I'm just asking you, was she in this deal?

13    A.   No.  There was -- this is a Rock Financial deal.  No.

14    Q.   And Unistate was not in this deal.

15    A.   No.  It was a Rock Financial deal.

16    Q.   In the first DealStructurer deal, there was 150,000

17    provided by Dwight Jenkins, correct, for the CD?

18    A.   Correct.

19    Q.   All right.

20              MR. DUVA:  And look at 1Q.

21    BY MR. DUVA:

22    Q.   That's the flow chart that was admitted through forensic

23    accountant Mr. Stevens?

24    A.   Okay.

25    Q.   So that 150,000 was split three ways, right?
```

1   A.   Correct.

2   Q.   It goes to you and Mitchell Holland at $61,825 apiece,

3   right?

4   A.   Yes, just as I described in my testimony to Mr. Holland

5   [sic].

6   Q.   And the rest went to Elliott Smith.

7   A.   Correct.

8   Q.   All right.  And of the three of you at this point --

9   based on your diligent research of the DTC and alternative

10  investments and the like, of the three of you, you knew the

11  most about the DTC and its inner workings at that point,

12  correct?

13  A.   I don't know if I knew the most.  I knew what I knew about

14  it.

15  Q.   Do you think -- I mean, we met Elliott Smith.  Do you

16  think he really knew anything about it?

17  A.   I can't comment on Elliott Smith's knowledge.

18  Q.   Now, did you talk to Mr. Holland about the DTC?

19  A.   Yes.

20  Q.   Did he -- did you know more about it than him, or did he

21  know more about it than you?

22  A.   We knew many of the same things.  The only thing I knew

23  more about was on the specific documents that -- that I was

24  shown earlier, in my earlier testimony, looking at that

25  specific type of posting of information.

1 Q. And which you never mentioned in the grand jury,

2 correct?

3 A. I believe that's incorrect.

4 Q. Okay. Well, I'm not going to hand it to you and have

5 you read through it. We can -- they will consider whether

6 you ever mentioned AIS, among other things, okay?

7 A. I didn't say --

8 Q. Is that fair?

9 A. No. I didn't say I didn't mention AIP.

10 Q. AIP. I'm sorry.

11 A. I said I had done some work with DTC beforehand.

12 Q. You were never a member.

13 A. Never a member.

14 Q. So in other words, you were in a position where not

15 being a member, you couldn't have confirmed the existence of

16 the CD, right?

17 A. I counted on the customer to do that. That's how the deal

18 was set up.

19 Q. Now, you listened to their testimony. Other than

20 Mr. Leake's confusion, could anybody confirm it?

21 A. To my knowledge, everybody confirmed it.

22 Q. Did you hear that in court?

23 A. Yes.

24 Q. From who?

25 A. Every single one of them.

```
 1    Q.    They all confirmed it?

 2    A.    (Nods head up and down.)

 3    Q.    Is that a yes?

 4    A.    That's a yes.

 5    Q.    Even though, as Mr. Jaijairam testified -- as

 6    entertaining as part of that may have been, he said they were

 7    zero for 13?

 8    A.    I'm talking about the customers.

 9    Q.    I'm sorry?

10    A.    I'm talking about the customers' confirmation.

11    Q.    How can somebody confirm something that's fake,

12    Mr. Rosenfeld?

13    A.    I --

14    Q.    How can that be done?

15    A.    Well, that would be the point, wouldn't it?  If the

16    customer's telling us they confirmed it, then I have to believe

17    that it's not fake because I'm believing that they've talked to

18    their advisors and their attorneys, which they all testified

19    that they did.

20          So I believe that there was no way that they were

21    going to come back and say, "I confirmed this," so their funds

22    could be released if they didn't actually do it.

23    Q.    Now, as the funds went in the escrow -- and, again, the

24    jury can look at the exhibits -- they went out pretty quick,

25    right?  It was always within five days usually?
```

1    A.    Yes.

2    Q.    Very quick.

3    A.    Yes.

4    Q.    So difficult to confirm something that's fake in five

5    days.  Wouldn't you agree with that?

6    A.    First of all, I didn't think it was --

7    Q.    Just assume for a second it was fake, hypothetically.

8    It would be difficult to confirm something is fake within a

9    five-day period.

10   A.    I would assume if it's fake, it would be impossible to

11   confirm.

12   Q.    That's my point.  Okay.

13          MR. DUVA:  Look at 7A.

14   BY MR. DUVA:

15   Q.    That's the Promotora deal?

16   A.    Okay.  Yes.

17   Q.    That's a $500,000 -- $100 million standby letter of

18   credit?

19   A.    Correct.

20   Q.    Again, Unistate had nothing to do with this deal,

21   correct?

22   A.    Correct.

23   Q.    But you're aware from two things -- one, the phone call

24   from Ms. Hardstone about the three Mexican nationals that

25   showed up at Commercial Escrow Services, right?

```
 1   A.    Yes.

 2   Q.    And also 7H.  That's the February 5th, 2010, e-mail to

 3   Mitch Holland on which you're copied -- that there is a

 4   significant complaint about the BBVA Bancomer standby letter

 5   of credit, right?

 6   A.    I'd have to see the letter.

 7   Q.    Well, it's the e-mail there.  It's at the bottom.

 8   February 5th, 2010, at 11:44 a.m.

 9         It says, "Jaime just returned from Mexico City with

10   the client (finance secretary and the DA).  They had a

11   meeting with Bancomer.  The bank informed them that the SBLC

12   they presented was not issued by them."

13         Correct?

14   A.    Yes.  I knew there was a complaint from their broker,

15   which is who this is.

16   Q.    That the BBVA document, the standby letter of credit,

17   was not real.

18   A.    It says that they do not recognize anything about the

19   SBLC.

20   Q.    Meaning it's not theirs.

21   A.    They can't recognize that they originated it.

22   Q.    Right.  And that's the one that we were looking at

23   earlier in the case in 7D.

24   A.    You'd have to show me 7D.  I don't know.

25   Q.    Right there.
```

1   A.    Yes.

2   Q.    So that's fake bank document No. 4, correct?

3   A.    Not according to the testimony of the escrow agent.

4   Q.    Well, according to this e-mail it is, right?

5   A.    According to this e-mail it is?

6   Q.    Yeah.  7H, the one we were looking at earlier where

7   Bancomer says this isn't theirs.

8   A.    They're saying they cannot recognize this SBLC.

9   Q.    All right.

10  A.    There was a significant amount of activity on this account

11  after this date.

12  Q.    Meaning?

13  A.    This is out of context.

14  Q.    Okay.  Meaning this SBLC was not Bancomer's.

15  A.    It was challenged that it was not a Bancomer SBLC, just as

16  the coordinates that were given by the customer were not valid

17  to be able to send it to either.

18  Q.    So in this instance, Jaime and his people, whoever they

19  are, they were wrong.

20  A.    Oh, no.  I'm not saying they were wrong.  I'm just saying

21  this is a piece of the puzzle taken out of context.

22            MR. DUVA:  Let's look at 7E.

23            Page 2.

24  BY MR. DUVA:

25  Q.    On this deal you received $357,288?

```
 1   A.    Correct.

 2   Q.    And Mitchell Holland got $307,289?

 3   A.    Correct.

 4   Q.    And about 3.5 million went to Rio Doce?

 5   A.    Correct.

 6   Q.    It's on a successive page.

 7   A.    Correct.

 8   Q.    If you want us to confirm that, I can show it to you.

 9   A.    No.  That's correct.

10   Q.    And Unistate, again, not involved in this deal.

11   A.    No.

12         MR. DUVA:  Let's look at 33C.

13   BY MR. DUVA:

14   Q.    Now, this is some work that Forensic Accountant Stevens

15   did, correct?

16   A.    I believe you.

17   Q.    I'm sorry?

18   A.    I said I believe you.

19   Q.    And it has information from your Aster Capital, Inc.,

20   Compass Bank account, your Compass Bank account personal, and

21   another bank account as well, which appears to be a checking

22   and savings; is that right?

23   A.    Correct.

24   Q.    So on June 1st, 2009, with all of those together, you

25   had $121,854.20?
```

1   A.   From this accounting.

2   Q.   Do you dispute it?

3   A.   I have -- I do not dispute nor confirm it.

4   Q.   Well, you had provided the bank records in discovery,

5   right?

6   A.   I did, but I don't know that he did this right.

7   Q.   Well, you had about a year to decide, didn't you?

8   A.   To decide what?

9   Q.   If he did it right or not.

10  A.   No.

11  Q.   I mean, you had the bank records.  You could have done

12  your own accounting, summary charts, financials, things like

13  that?

14  A.   I could have done that.

15  Q.   But you didn't.

16  A.   No.

17  Q.   Okay.  So you're neither confirming nor denying this.

18  Is that what you're saying?

19  A.   That's what I'm saying.

20  Q.   Okay.  And so then just in about six months --

21       MR. DUVA:  Let's go to December 23rd, 2009.

22  BY MR. DUVA:

23  Q.   -- those accounts, the aggregate amount, quadrupled,

24  right, to $827,463.49?

25  A.   On this chart.

1    Q.    And that was based on the -- I'm sorry.  Are you

2    disputing that?

3    A.    No.  I said I agree on this chart, yes.

4    Q.    You did your own accounting at the time, right, kept a

5    checkbook, online banking, that kind of thing?

6    A.    Yes, and all my records are there.

7    Q.    All right.  And so do you have any reason to dispute

8    this?

9    A.    I have no reason to dispute it nor confirm it.

10   Q.    I'm not following that, sir.

11   A.    Well, I guess what I'm saying is I don't keep in my memory

12   my account records from three different accounts this far back

13   in time.

14   Q.    But people really know how much they're worth, don't

15   they, kind of walking around on a daily basis, I mean, in a

16   financial sense?

17   A.    No.  I can't follow that.

18   Q.    I mean, do you just have so much money that you just

19   have no idea or what?

20   A.    I work on a cash-flow basis.

21   Q.    That's a common human experience, isn't it, to know what

22   you have coming in, what you have going out, what you have

23   saved, what you owe?

24   A.    I did not memorize my bank records from six years ago.

25   Q.    But you really don't have any valid reason, from what

1    I'm hearing, to dispute these numbers.

2    A.    I'm not disputing them.  I'm just not confirming them

3    either.

4    Q.    That's the old, "I'm neither going to confirm nor deny"

5    line we sometimes hear in other walks of life?

6             MR. STONE:  Objection, Your Honor, argumentative.

7             THE COURT:  I guess that's a legal term, Mr. Duva.

8    Ask another question.

9    BY MR. DUVA:

10   Q.    Let me ask you something, if you remember this.

11            Do you remember paying off your house on Christmas

12   Eve in 2009?

13   A.    Well, I don't remember Christmas Eve, but yeah, I paid off

14   my house in December of 2009.

15   Q.    And essentially that was from the money that you derived

16   in large part by that six months of work that you did with

17   Vital Funds.

18   A.    No.

19   Q.    Well, let's go back then.

20            On June 1st, 2009, did you have enough money to pay

21   off the house?

22   A.    Looks like I would have been around a hundred thousand

23   short.

24   Q.    Maybe 150,000?

25   A.    I said about a hundred thousand.  I don't remember my bank

1  records from six years ago.

2  Q.   Can you remember the payoff being 273,000 and change?

3  A.   No, I do not.

4  Q.   But you paid off the house, right?

5  A.   Yes.

6  Q.   And it's that nice one that we showed in evidence,

7  correct?

8  A.   Right.  It's the house I bought before all these deals.

9  Q.   All right.  Which had a mortgage on it.

10  A.   Yeah.  I had a small mortgage on it.

11  Q.   And you bought it in 2009?

12  A.   Correct.

13  Q.   The price was probably a little bit lower, pretty good

14  deal?

15  A.   Average, I would say.

16  Q.   What's it worth today?

17  A.   Maybe 435,000.

18  Q.   No liens against it?

19  A.   Yes, there are.

20  Q.   What, did you finance it again?

21  A.   No.  You put a lien on it.

22  Q.   Oh, yeah.  That's true.

23       All right.  So the bottom line is, you know,

24  hearing all these deals and, you know, you said, sort of like

25  Mr. Hedrick, you believe that they were fake, I mean, do you

1    have any plans to give anybody any money back?

2    A.   I would make restitution on any proof that was shown to me

3    that I took illegal action in a transaction.

4    Q.   So if you realized you were involved in a fake

5    transaction and had all this money available, you wouldn't

6    give it back to the victims to do the right thing?  Just not

7    your thing?

8    A.   I thought I was pretty clear in my answer.

9    Q.   So the answer is no?

10          MR. STONE:  Objection, Your Honor.  May we approach?

11          THE COURT:  Okay.

12      (At sidebar, out of the hearing of the jury:)

13          THE COURT:  Yes.

14          MR. STONE:  This is an improper line of questioning

15   about whether my client, you know, will or will not return

16   money six years after the fact to people who did not complain

17   during the -- during the --

18          THE COURT:  I'll sustain the objection.

19          MR. DUVA:  I'm done with it anyway.

20      (End of discussion at sidebar.)

21          MR. DUVA:  Let's look at 3D as in dog.

22          Actually, you know what?  Let's go back to -- I'm

23   sorry.  Let's go to 33D.

24          I don't think that's 33D.

25          MS. STOCKHOLM:  Oh, sorry.

```
 1              MR. DUVA:  33D.
 2   BY MR. DUVA:
 3   Q.   That's a summary of debits from your account during a
 4   period of time?
 5   A.   It appears to be.
 6   Q.   When did you join the Gleneagles Country Club?  That's a
 7   pretty nice place.
 8   A.   I joined Gleneagles in 2010.
 9   Q.   So that was, in essence, with money that you took in
10   with your partnership with Vital Funds?
11   A.   I was taking in lots of money from my other deals.
12   Q.   Which other deals were those, sir?  We have your bank
13   records.
14   A.   My Lincoln deals.  You have my bank records.  You can look
15   it up.
16   Q.   Okay.  Let's do it.
17              MR. DUVA:  Let's look at 33E.
18   BY MR. DUVA:
19   Q.   This is an accounting in 33E of the moneys that you took
20   in March 1st, 2008, through December 31st, 2010, into those
21   accounts; is that right?
22   A.   Yes.  This is a 20- -- I'm sorry.  This is -- yeah, this
23   is just under two years.
24   Q.   You took in money from -- mostly from Commercial Escrow
25   Services?
```

```
1   A.   Well, that's -- yes, because they were the escrow company.

2   Q.   For those deals as well?

3   A.   Well, for every deal that went through es- -- Commercial

4   Escrow Company.

5   Q.   And you took in $33,666 from Seasoned Funds?

6   A.   Yes.

7   Q.   Is that Mitchell Holland?

8   A.   Correct.

9   Q.   And also another 21,750 from Trillions Capital?

10  A.   Correct.

11  Q.   Do you know if Mr. Holland did any deals in the

12  trillions?

13  A.   In the trillions?

14  Q.   Right.  Just like the name suggests, Trillions Capital

15  Group.

16  A.   I'm not aware of any -- I'm not aware of all of his deals.

17  Q.   Did you ever ask him?

18  A.   About all of his deals?

19  Q.   Right.

20  A.   No.  I never asked him about all of his deals.

21  Q.   You didn't ask him in your face-to-face meetings?

22  A.   I never had a face-to-face meeting with Mr. Holland until

23  this trial.

24  Q.   Well, until your initial appearance, right?

25  A.   Right, the initial appearance on this case.
```

1    Q.    May 21st, 2014?

2    A.    That sounds right.

3              MR. DUVA:  Go to page 3.

4    BY MR. DUVA:

5    Q.    This is money spent from that account during that same

6    period of time, or those three accounts, March 1st, 2008,

7    through December 31st, 2010, right?

8    A.    This is money disbursed from those accounts.

9    Q.    Okay.  So you agree?

10   A.    That they were disbursed from those accounts, I agree.

11   Q.    And you sent $270,406 to Seasoned Funds?

12   A.    Yes.

13   Q.    And Seasoned Funds was essentially dead with the birth

14   of Vital Funds, right?

15   A.    I believe that's -- that the company name change that

16   Mr. Holland -- that Dr. Holland accomplished was from Seasoned

17   to Vital.

18   Q.    And some of these deals that we looked at as well, you

19   sent money to Shanthi Holland?

20   A.    I did.

21   Q.    Is that Mr. Holland's -- or at the time Dr. Holland's

22   wife?

23   A.    Ex-wife.

24   Q.    At the time it was his ex-wife?

25   A.    Yes, to my knowledge.

1    Q.    You're sending $68,777 to her during this period of

2    time?

3    A.    Correct.

4    Q.    For what?

5    A.    Because Dr. Holland had a new relationship, and he was

6    getting married, and he didn't want it to look like he was

7    financing his ex-wife.

8    Q.    So you financed her?

9    A.    No.  These were funds that he earned, and he asked if it

10   was okay if instead of it going through his account and him

11   sending it, it went through my account and I sent it to help

12   him out.  And I did, and I 1099'd her.

13   Q.    That's a pretty close relationship, right, paying

14   somebody's ex-wife because they have a new relationship even

15   though you've never met the person?  That's -- that's a

16   closeness there, isn't it?

17   A.    Well, I thought I was doing him a favor.  From an

18   accounting standpoint, it didn't hurt anybody.  The IRS got

19   paid the same amount of money.

20             MR. DUVA:  Let's look at 3D.

21   BY MR. DUVA:

22   Q.    I mean, you had this 50/50 deal with Mr. Holland, right?

23   I mean, in other words, 50/50, that's -- another word for

24   that is a partnership, coequal partners?  I'm sure you've

25   heard that term.

1   A.   I understand your question, and the answer is no.

2   Q.   You weren't coequal partners?

3   A.   No.

4   Q.   You were just a capitalist, right?  You got a great

5   deal.  You took advantage of it.

6   A.   I was doing -- I was doing subcontract work, or as they

7   like to call it these days, outsourced work.

8   Q.   But in your own words on direct, you're a capitalist.

9   A.   That's true.  I'm not a Communist.

10  Q.   Not what I meant.  I don't think that's what you meant

11  either.

12  A.   That's exactly what I meant.  That's an economics term.

13           MR. DUVA:  Let's look at 3D.

14  BY MR. DUVA:

15  Q.   In any event, you're aware that Mitchell Holland kind of

16  made a bad deal, but you were going to take advantage of it

17  because of your capitalistic nature.

18  A.   I did not think he made a bad deal.

19  Q.   He didn't make a bad deal even though all you had to do

20  on this contract was take off Aster Capital, put on Vital

21  Funds, and read the four Unistate agreements each time?

22  That's it?

23  A.   I thought my 33 years of knowledge and experience that I

24  could apply to this situation was worth what I was paid.

25  Q.   Which included leasing furniture and selling telephones,

```
 1   correct?
 2   A.   And --
 3           MR. STONE:  Objection, Your Honor.  That's
 4   argumentative, and that's so ridiculous.
 5           THE COURT:  Overruled.
 6           You can answer the question.
 7           THE WITNESS:  It was primarily based on my 33 years
 8   of experience in business that included mortgage brokering,
 9   creating an online credit card payment transaction system from
10   scratch, creating a telecommunications company from scratch.
11   BY MR. DUVA:
12   Q.   And for all of that, how much money did you have on June
13   1st, 2009?
14   A.   June 1st, 2009?
15   Q.   Yeah.  121,000?  I mean, not a small amount, I get it,
16   but it's not entrepreneurial huge gains either, right?
17   A.   Well, no.
18   Q.   Especially at 54.
19   A.   I mean, do you want -- I mean, I'd be happy to explain the
20   mistakes of why it was there.
21   Q.   No, I don't think so.
22   A.   Okay.
23   Q.   So --
24   A.   You know, divorces take half your money and things like
25   that.
```

```
 1   Q.   Hold on.  Hold on.

 2        In your own words, as you said in the grand jury,

 3   "Why did you get involved in it?" you said, "I needed more

 4   money."

 5   A.   That's why I get involved in every deal I get in.

 6   Q.   Which you quadrupled in six months on something that was

 7   totally not real.

 8   A.   At the time I was 100 percent sure it was real.

 9   Q.   Okay.  But you're 100 percent sure today that it's not

10   real, right?

11   A.   I am convinced that there are serious problems with this.

12   Q.   So all we have to get to is what you knew at the time.

13   That's it.  That's all that's left is your intent and

14   knowledge at the time.

15        THE COURT:  Is that a speech or question?

16   BY MR. DUVA:

17   Q.   Is that right?

18        THE COURT:  No.  Ask a question of him.

19   BY MR. DUVA:

20   Q.   All we have to concern ourselves now with is what you

21   knew at the time.

22        THE COURT:  I don't want to be technical, but he

23   doesn't have to say what we have to concern ourselves with.

24        MR. DUVA:  I'm just asking him, Your Honor, if the

25   inquiry is what he knew at the time.  I think Mr. Stone made
```

1   that clear.

2           THE COURT:  You can say your inquiry is what he knew

3   at the time.

4           MR. STONE:  Your Honor, this is argumentative.

5           THE COURT:  I understand, Mr. Duva.  It's okay.

6           MR. STONE:  He's arguing with the witness.

7           THE COURT:  You've made a statement.  Nobody

8   disagrees.  The issue is what did he know at the time.  What's

9   your question?

10          MR. DUVA:  That's all I'm trying to illustrate.

11          Let's look at 3D.

12          Go to the account agreement.

13  BY MR. DUVA:

14  Q.   So on November 4th, 2009, even after all that money

15  going back and forth between you and Mr. Holland and you're

16  paying off Holland's ex-wife, you still never met the guy.

17  A.   In person?

18  Q.   Correct.

19  A.   Correct.

20  Q.   Now, you're a businessman, right?

21  A.   I am.

22  Q.   Closed a lot of deals?

23  A.   I do.

24  Q.   33 years?

25  A.   Yes.

1   Q.   Now, I'm just a government lawyer, so see if we can

2   follow this.  I'm not a businessman, okay?  Fair enough?

3   A.   Fair enough.

4   Q.   In business or in any situation, isn't the better

5   practice to get in a room with somebody, shake their hand,

6   sit down with them, eyeball them, see what they're all about?

7   A.   I've made over 80 percent of the money in my entire career

8   without ever being face-to-face with a person.

9   Q.   What I'm asking you is, don't you think the better

10  practice is to do those things?

11  A.   Well, I guess my answer is no, since the proof of my own

12  performance is that that's not necessary, nor is it necessarily

13  the most effective way to do it.

14  Q.   Well, I think a lot of people would disagree with that,

15  and so, you know, we're talking about --

16         MR. STONE:  Objection, Your Honor, argumentative.

17         THE COURT:  Well, that's an argument.  Okay.

18         What's your next question?

19         MR. STONE:  Obviously Mr. Duva disagrees.  I don't

20  know if he's met his (talking at the same time as judge

21  inaudibly.)

22         THE COURT:  All right, Mr. Stone.  We don't have to

23  have dueling speeches here.

24         MR. DUVA:  I have actually.

25         THE COURT:  Mr. Duva, what's your question?

1      MR. STONE:  (Talking at the same time as judge

2  inaudibly.)

3      THE COURT:  Mr. Duva -- we're not having this

4  debate -- what's your next question?

5      MR. DUVA:  I really want to ask if Mr. Rosenfeld

6  disputes that I met Loretta Lynch two weeks ago, who's supposed

7  to be confirmed today.  That's what I want to ask, but he

8  doesn't know.  He wasn't there.  Neither was Mr. Stone.

9  BY MR. DUVA:

10  Q.    All right.  Looking at the account agreement.

11  A.    Okay.

12  Q.    This is the Sayar deal?

13  A.    Yes.

14  Q.    Now, in the warranty section it talks about level 7

15  access, correct?

16  A.    Correct.

17  Q.    And did you write that term in?  That's your writing?

18  A.    I did.

19  Q.    And your version, which I believe is different than

20  Mr. Kerr's, but let me see if I can summarize your version

21  accurately, that to have level 7 access, you have to have a

22  Series 24 license and be a supervisor in a brokerage firm; is

23  that right?

24  A.    I don't know if Mr. Kerr said that.

25  Q.    No.  I'm saying did you say that on direct.

1   A.   Okay.   Then would you please restate the question?

2   Q.   To have level 7 access, do you have to have a Series 24

3   license or be a supervisor in a brokerage firm?

4   A.   That's my understanding, yes.

5   Q.   Do you know anyone that has level 7 access?

6   A.   Yes.

7   Q.   Do you, really?

8   A.   Yes.

9   Q.   Even though Mr. Kerr testified it doesn't exist?

10  A.   Yes.

11       Do you want to know who it is?

12  Q.   No.   I think I know.

13  A.   Okay.

14  Q.   I think we all met him earlier.

15  A.   All right.

16  Q.   All right.   Look at 3F.

17  A.   Okay.

18  Q.   And that's the $622,500 wire from Mr. Sayar to

19  Commercial Escrow Services?

20  A.   Looks like it.

21  Q.   And the date of that is the 4th, correct?

22  A.   Correct.

23  Q.   I'm sorry.   Just for clarity's sake, that's the 4th of

24  November, 2009?

25  A.   Correct.

1  Q.   Now, 3I, that's the transmission and e-mail on November

2  11th, 2009, of the access codes?

3  A.   It has to be bigger.

4       MR. DUVA:  If we can blow up the bottom.  It spills

5  over into the next page.

6       THE WITNESS:  It appears to be.

7       MR. DUVA:  Okay.  If we could blow up the e-mail so

8  we can see the date.

9  BY MR. DUVA:

10  Q.   So that was on the 11th, 2009?

11  A.   Seven days later.

12  Q.   And those are the --

13       MR. DUVA:  Go on to the following page.

14  BY MR. DUVA:

15  Q.   And that's the information to get on the Chase screen 13

16  with the first code, certificate number, and the account

17  number?

18  A.   Correct.

19  Q.   So that's what Mr. Sayar was armed with to go -- go

20  forth and verify, so to speak.

21  A.   That's what Unistate gave him to do that.

22  Q.   Okay.

23       MR. DUVA:  Let's look at 3J.

24       Page 2.

25  BY MR. DUVA:

1   Q.   Now, you and Mr. Stone have called this a receipt,
2   correct?
3   A.   And the contracts do also.
4   Q.   Okay.  Nobody else has, right?
5   A.   Other than the contracts?
6   Q.   I'm talking about a physical human being that's been in
7   the courtroom.
8   A.   Yes.  Other people have called it that.
9   Q.   Who was that?
10  A.   I know Mitchell Holland did.  I know --
11  Q.   He did?
12  A.   Yes -- oh, no, not Mitchell Holland.  I know Mr. Shorstein
13  did --
14  Q.   Okay.
15  A.   -- and I know Mr. Stone did.
16  Q.   Okay.  How about nonlawyers?  Not you, but other
17  witnesses.
18  A.   I do not recall if Mr. Hedrick did or not.  I am pretty
19  sure he explained it that way.  I don't know if he used the
20  exact words that you're talking about.
21  Q.   So the issue date on these documents, or this one, is
22  November 11th, 2009?
23  A.   Correct.
24  Q.   And what your position is, this is just the issue date
25  of the receipt, correct?

1  A.   That's correct -- no.  This is not the issue date of

2  the -- I don't know.  I'd have to look at my records.

3  Q.   Well, you're looking at the -- you're looking at the

4  receipt, right?

5  A.   November 11th, first set -- it was --

6  Q.   Mr. Rosenfeld --

7  A.   I'm reading.

8  Q.   You haven't seen this before?

9  A.   I've seen it before, yes.

10  Q.   And the issue date says 11 November 2009.

11  A.   The issue date for what, the instrument or this document?

12  Q.   That's what I'm asking you.

13  A.   That's why I'm reading the document, so I can give you the

14  correct answer.

15        This does not show the issuance date of the receipt.

16  This shows the issuance date of the CD.

17  Q.   So that we can all agree, the issue date of this CD was

18  November 11th, 2009.

19  A.   Yes.

20  Q.   All right.  And other documents that are just like this

21  one, which there's 20 or 30 in the case, would be the same

22  answer.

23  A.   Yeah.  The same answer would be these were issued two to

24  five days after the instrument was confirmed.

25  Q.   Okay.  But on this particular occasion, the information

1  to confirm the instrument and the issue date is the same day,

2  right, November 11th, 2009?

3  A.   I don't have the -- again, I don't have the issuance date

4  of this document.  All I have is the issuance date of the

5  instrument.

6  Q.   All right.  The issuance date of the instrument -- we'll

7  just move on -- is November 11th, 2009.

8          MR. DUVA:  Let's look at 3JJ.

9  BY MR. DUVA:

10 Q.   Now, that's the disbursement of Sayar's money, the

11 $622,500?

12 A.   Okay.

13 Q.   Goes to Commercial Escrow Services on November 4th,

14 2009?

15 A.   Correct.

16 Q.   And it's in your pocket, or at least part of it, on

17 November 9th, 2009.

18 A.   According to this document.

19 Q.   Do you dispute it?

20 A.   I would need to look at my records to confirm it.

21 Q.   Do you want to?

22 A.   I can if you want.

23 Q.   It's up to you.  You're on the stand, not me.

24 A.   I'd be happy to do it.

25 Q.   Okay.  We'll get to that.

```
 1              So you're paid, and Holland, before the issuance
 2   date of the CD and before the information is provided, at
 3   least according to this.
 4   A.   According to these documents, it would --
 5   Q.   But you've got to confirm.
 6   A.   -- appear so, but I know that I can confirm otherwise.
 7   Q.   You can confirm otherwise?
 8   A.   Yes, I can.
 9   Q.   You were paid on a different day?
10   A.   I can confirm that the disbursement funds were issued on
11   the date that the CD was confirmed on the DTC and that the
12   receipt was issued after that day.
13              MR. DUVA:  Let's look at 3H.
14   BY MR. DUVA:
15   Q.   We won't belabor it.
16              Those are the Sayar documents, the Unistate
17   documents.
18              MR. DUVA:  Starts on page 2.
19   BY MR. DUVA:
20   Q.   And they're dated November 9th, 2009, right?
21   A.   It's too small.
22              Yes.
23   Q.   Same day you got your money?
24   A.   Yes.
25              MR. DUVA:  Let's look at 2R on the Justin Nemec/WCSP
```

1    deal.

2    BY MR. DUVA:

3    Q.    Now, we met Mr. Leake today, right?

4    A.    Yes.

5    Q.    He testified that he confirmed something on the Internet

6    and that he wasn't really sure; is that right?  Is that a

7    fair assessment?

8    A.    He confirmed a specific network that he confirmed the CD

9    on.

10   Q.    And then admitted he was confused?

11   A.    He admitted that the network no longer existed.

12          MR. DUVA:  Let's look at page 2 of 2R.

13   BY MR. DUVA:

14   Q.    You were copied on this October 7th, 2009?

15   A.    Okay.

16   Q.    "Justin, read below from Warren.  When you are ready,

17   fill out again and forward back to me.  If you wish to talk

18   to Mitch or Warren, let me know.  Warren is available as well

19   in case you cannot connect with Mitch concerning this issue?"

20   A.    Right.

21   Q.    That's from Rusty Russell?

22   A.    That's correct.

23   Q.    Have you ever met Rusty Russell?

24   A.    No.

25   Q.    And on page 1, there's a follow-up there.

1        It says, "Justin, I was wrong in the contacting

2  area.  Warren is not to be contacted," capital N-O-T.

3  A.    Correct.

4  Q.    "You need to contact Mitch, who is already handling your

5  file.  Mitch is aware of your request and will need you to

6  send in writing as well the request to reblock the DTC for

7  Key Alliance and bring him up-to-date on what you are doing

8  with your process to fund your CD."

9        Correct?

10 A.    Correct.

11 Q.    That's just because you're the glorified paper pusher,

12 as you testified in the grand jury.  Your words, not mine.

13 A.    That's incorrect.  That's not what this says.

14 Q.    No.  I'm saying the reason you were not to be contacted,

15 you were just a paper pusher.

16 A.    That's not the reason.

17 Q.    What's the reason?

18 A.    The reason is I had no role in directly communicating with

19 the customer, and if you have several people communicating with

20 the customer on the same issue, it causes confusion internal to

21 what you're trying to accomplish to service the customer's

22 needs.

23        So this was communicated to him to say, "Let's keep

24 down the points of contact so we can more effectively

25 communicate with you and provide better customer service."

```
1   That's what this e-mail is about.

2   Q.   Is it maybe because you didn't want to have a record of

3   communicating with customers?

4   A.   It's the reason I just explained.

5   Q.   I mean, these are your contracts, right?

6   A.   What are my contracts?

7   Q.   The account agreements.  You drafted --

8   A.   No.  They're the Vital account agreements.

9   Q.   Well, they were born out of your writing, your

10  experience, your --

11  A.   That's correct.

12  Q.   -- time, your expertise.

13  A.   That's correct.

14  Q.   And you were paid on a commission basis.

15  A.   Correct.

16  Q.   Now, there's a lot of lawyers out there, right?

17  A.   Many.

18  Q.   About 80-some thousand in the Florida Bar?

19  A.   Couldn't -- wouldn't have any idea.

20  Q.   Probably just as many in Texas?

21  A.   I don't know the number of lawyers in each state.

22  Q.   Probably more in California?

23  A.   Same answer.

24  Q.   And there are some good ones?

25  A.   I assume there's good, and I assume there's some bad
```

```
 1  lawyers.
 2  Q.    And there are some really bad ones, right?
 3  A.    I would assume.
 4  Q.    And there are some in the middle of the road, and --
 5  there's a continuum.
 6  A.    I don't understand your question.
 7  Q.    I'm just asking you, would you agree with that?
 8  A.    That there's all kinds of different performance --
 9  Q.    Yes.
10  A.    -- levels in professionals?
11  Q.    Correct.
12  A.    I would agree with that statement.
13  Q.    And that's any profession, any walk of life, right?
14          MR. STONE:  Objection, Your Honor, relevance.
15          THE COURT:  It does seem that you're just making
16  rhetorical questions here, Mr. Duva.
17  BY MR. DUVA:
18  Q.    But you agree with that.  Any walk of life, there's
19  good, bad, ugly, indifferent, middle of the road.
20          THE WITNESS:  I thought we just handled that
21  objection.
22          THE COURT:  I think that -- I'll take judicial notice
23  there's a lot of lawyers.  We'll stipulate some are very good
24  and some are very bad.  That's established.
25          Now, let's go on.  And that's in Florida, Texas,
```

1  California, everywhere.

2  BY MR. DUVA:

3  Q.    Look at 42A there in front of you.

4  A.    (Complies.)

5          MR. DUVA:  Could you blow up the deals there first?

6          It's a little hard to see on that.  We're going to

7  have to kind of take it in steps here.

8  BY MR. DUVA:

9  Q.   So this is the chart that was admitted on those six

10  transactions.

11          Do you recall that, sir?

12  A.   I don't recall the chart, but if it was admitted, it was

13  admitted.

14  Q.   Let's look at -- for those six deals, we're going to

15  look at how much money you made.

16          MR. DUVA:  It's about middle of the chart next to the

17  Vital Funds column.

18  BY MR. DUVA:

19  Q.    So $540,351 in about six months?

20  A.    That's what the chart says.

21  Q.    That's about 8,000 -- 7,500 more than Mitchell Holland?

22  A.    About $8,000 more, a little more than 8,000, yes.

23  Q.    And those are just those six that we've covered,

24  correct?

25  A.    Correct.

1          MR. DUVA:  Let's look at 42B.

2     BY MR. DUVA:

3     Q.   We'll look at the rest, or at least some of the rest.

4          That's a chart with those deals:  Symtech,

5     MagMetal, both DealStructurer, Bentley Equities, WCSP,

6     Progressive, Sayar, Alpha, Winum, Promotora, and then Aurora?

7     A.   Yes.

8     Q.   And Mitchell Holland, Vital Funds, and Seasoned Funds

9     made about 1.2 million?

10    A.   Yes.

11    Q.   And you made about 1.2 million, a little bit more?

12    A.   Correct.

13    Q.   All on something that you're just finding out for the

14    first time today is not legitimate, for the first time during

15    the trial?

16    A.   Show me the names associated with these accounts, please.

17    Q.   (Complies.)

18    A.   These aren't -- all these aren't a -- aren't part of this

19    case.

20    Q.   I'm just asking you how much money you made on these.

21    A.   On these contracts?

22    Q.   Yes.

23    A.   If this accounting is correct, that's how much I made.

24    Q.   Okay.  How much did Chris Jaijairam make?

25          MR. DUVA:  Let's go over to that section.

```
 1            MR. STONE:  Objection, Your Honor.  What

 2    difference --

 3            THE COURT:  Well, if it's on the chart, it's on the

 4    chart, and you can point to it because it's in evidence.

 5    That's okay.

 6            MR. STONE:  Your Honor, having this witness comment

 7    on --

 8            THE COURT:  Oh, no, he's not going to comment on it.

 9    I presume there's a question behind it.

10            But if this chart shows how much he made, then you

11    can point to it.  It's in evidence, but ask him a question

12    that's for him.

13    BY MR. DUVA:

14    Q.    Jaijairam made $143,019.07?

15            THE COURT:  That's a fact in evidence.  Okay.

16            THE WITNESS:  According to this chart.

17    BY MR. DUVA:

18    Q.    And Smith made $150,740?

19    A.    According to this chart.

20    Q.    So Jaijairam made less than Smith.  I'm pointing out the

21    obvious, I know.

22    A.    Yes.

23    Q.    Now, Mr. Rosenfeld, if you had made on these deals, the

24    Unistate ones, you know, in the neighborhood of over 600-,

25    $700,000, right, and if they had gone through, at least on
```

1   the Sayar, in 60 days Mitchell Holland was expecting a

2   payment, per the contract that you drafted, of $14 million,

3   right?

4   A.    Correct.

5   Q.    And you and Mitchell Holland were going to split the

6   profits that he was to take from the 14 million.

7   A.    You're suggesting he was making 14 million?

8           MR. DUVA:  We'll go to 3D.  Let's go to 3D.

9           Go to the addendum to the account agreement.  To the

10  addendum.  It's two pages over.

11  BY MR. DUVA:

12  Q.    The final payment in 60 days was 14 million, right?

13  A.    That's correct.

14  Q.    To the Vital Funds bank account?

15  A.    That's correct.

16  Q.    And you were supposed to get 7 million?

17  A.    No.

18  Q.    How much were you getting of the 14 million that went to

19  the Vital Funds bank account?

20  A.    I'd have to look up the records because the vast majority

21  of that amount goes to Unistate to pay the Unistate lease

22  agreement that's due in 60 days, and that's why the 60 days

23  matches up.

24          So if everything you're showing in this trial is

25  dependent upon that concept, then you missed the boat.

1  Q.   But that never happened, right, not one time?

2  A.   What never happened?  Was the payment made?

3  Q.   The payment after 60 or 90 days.

4  A.   Not that I'm aware of.

5  Q.   But you and Mitchell Holland get paid because of the

6  initial fee, correct?

7  A.   We get paid according to the terms of this contract.

8  Q.   That's what I'm saying.  You got paid based on the

9  arrangement fee, the initial portion, the first portion of

10  the arrangement fee.

11  A.   The initial payment we made money on.

12  Q.   Which there would be $622,500.

13  A.   Well, we didn't make all that money.

14  Q.   I'm saying based on that.  You got a portion of it.  You

15  got 78,000 --

16  A.   Yes.

17  Q.   -- on that occasion.

18  A.   Correct.

19  Q.   So ultimately, at that point, it doesn't matter whatever

20  happens after that point.  If the deal fails, is fake, is

21  real, is great, is not great, you still keep that money on

22  the initial arrangement fee, right?

23  A.   We keep the money based on the performance of the

24  contract.

25  Q.   And so going back to the first page of the account

 1    agreement, the Vital Funds agreement, which you drafted --

 2    and that's essentially the same agreement as the MagMetal

 3    agreement that we looked at earlier, correct?

 4    A.    It has very similar terms.

 5    Q.    And even though you're getting paid on a commission

 6    basis, which I get that's your testimony, to get paid all

 7    that money, the 78,000, all you had to do was put in

 8    pertinent information in this agreement and read the Unistate

 9    agreements, which you had already seen, correct?

10    A.    I had to do that utilizing my 33 years of business

11    experience and knowledge.

12    Q.    So how many hours did that all take you?  I'm just

13    talking about this deal.

14    A.    33 years.

15    Q.    I'm not talking about it took you 33 years.

16          I'm talking about this agreement, drafting this

17    agreement, and reviewing the Unistate agreements.  How many

18    hours did it take you to do those things?

19    A.    Several hours.

20    Q.    How many?

21    A.    Several hours.

22    Q.    Ten?

23    A.    Eight to nine.

24    Q.    So you made about $9,000 an hour?

25    A.    On this particular deal.

1   Q.   Okay.

2   A.   But you're forgetting to average in all the work I did on

3   all the deals I didn't get paid on.

4   Q.   All the ones that didn't go through for another reason?

5   A.   Right.

6   Q.   Okay.  All right.  But what I'm asking, I mean, you've

7   seen the -- we're not Dallas, but Jacksonville, a

8   decent-sized city.  I mean, there's a lot of law firms at the

9   top of a lot of those buildings with a lot of pretty smart

10  lawyers in them, right, as far as you know?

11  A.   Uh-huh.

12  Q.   And, I mean, you could go to, like, a really expensive

13  guy for 500 bucks an hour?

14  A.   Hey, I've paid 15,000 an hour for a lawyer.

15  Q.   And, I mean, it would take, I don't know, four or five

16  hours to look at these things, couple pages apiece, to look

17  at the account agreement?

18  A.   Well, like I said, I spent eight or nine hours total.

19  Q.   Yeah.  So not that long, right?

20  A.   It's eight or nine hours.

21  Q.   And you could pay somebody a lot less to do what you

22  were doing, correct?

23  A.   I don't know that I could pay them less to get it right.

24  Q.   This is too difficult for someone in one of those law

25  firms, some private lawyer?

```
 1              MR. STONE:  Objection, argumentative.

 2              MR. DUVA:  He said they couldn't get it right, Your

 3    Honor.

 4              THE COURT:  Okay.  You can answer that question.  It

 5    took a special expertise.

 6    BY MR. DUVA:

 7    Q.    So you don't think they could do it?

 8    A.    It took special expertise.

 9    Q.    Only you have it?

10    A.    I think I'm one of the -- I think I'm one of the -- in the

11    low percentage of the people in the country that have it.

12    Q.    But you couldn't figure out that this deal wasn't real?

13    A.    I did a lot of work that showed that it was real.

14    Q.    By going on the Internet after the fact and going to the

15    Wayback and pulling up those images?

16    A.    Oh, no.  I did all that work before then, beforehand.

17    Q.    Which we asked in the grand jury subpoena, and you

18    didn't provide?

19    A.    I'm sorry?

20    Q.    Which we asked for in the grand jury subpoena but you

21    didn't provide?

22    A.    I provided all the documents I had at the time.

23    Q.    All documents related to the Sayar deal, right?

24    A.    Correct.

25    Q.    But you produced nothing with respect to AIP, did you?
```

1    A.    That wasn't directly related to the Sayar deal.  That was

2    related to the Lincoln deal.

3    Q.    Well, your position is that this is not something that

4    should have been DTC, that I missed the boat, Agent Adams

5    missed the boat, and this was an AIP thing, correct?  I mean,

6    that's what we heard in the opening.

7    A.    It was an AIP thing, but I got that knowledge and did that

8    work on my Lincoln work, not on anything to do that had with

9    Vital.  That was part of the knowledge I acquired in my 33

10   years.

11           MR. DUVA:  Let's look at 25B.

12   BY MR. DUVA:

13   Q.    Now, that's your website from February 9th, 2010?

14   A.    I can't see the date.

15   Q.    It's at the top right.  I'm sorry.

16   A.    Yes.  That's the date.

17   Q.    And you're still advertising certificates of deposit and

18   standby letters of credit?

19   A.    Yes, but these were not Unistate.

20   Q.    I'm just asking, you're advertising them generally?

21   A.    Yes.

22           MR. DUVA:  Go to 25D.

23   BY MR. DUVA:

24   Q.    August 7th, 2013?

25   A.    I can't read the date.

```
 1        Yes.
 2        MR. DUVA:  Let's go to page 5, the bottom, "What type
 3   of letters of credit can we arrange?"
 4   BY MR. DUVA:
 5   Q.   Why don't you go ahead and read the second one?
 6   A.   "The second type we can arrange is a standby or
 7   documentary letter of credit from the private banking division
 8   of a New Zealand building society.  Backed by a $6.2 billion
 9   fund," which I have the fund document on, "these instruments
10   are used primarily for commodities trading and to facilitate
11   various construction and development projects."
12        MR. STONE:  Your Honor, may we approach briefly?
13   BY MR. DUVA:
14   Q.   Is that General Equity Building Society?
15        MR. STONE:  Your Honor, may we approach briefly?
16        THE COURT:  All right.  You can approach.
17      (At sidebar, out of the hearing of the jury:)
18        MR. STONE:  I believe that Mr. Duva's going to ask
19   him why that was removed from his website, and the Court needs
20   to know that there was a request by -- not a request but an
21   order by the court to remove that from the website.
22        And so I don't believe it would be appropriate for
23   Mr. Duva to ask him --
24        THE COURT:  Ordered by this court?
25        MR. STONE:  Yes.
```

1          THE COURT:  Well, you can ask him if it was there,

2    but you can't ask him why he removed it.

3          MR. DUVA:  When was that ordered by this court?

4          MR. STONE:  Because that would be my client's

5    response.

6          MR. DUVA:  When was that ordered?

7          MR. STONE:  I'm not -- that -- I don't know when

8    that --

9          MR. DUVA:  By the Middle District of Florida?

10          MR. STONE:  I believe it was probably pretrial

11    services that suggested that that be removed when it was

12    brought to their attention, so he removed it.

13          MR. DUVA:  I have --

14          MR. STONE:  I'm just saying --

15          MR. DUVA:  -- no recollection of that.

16          MR. STONE:  -- that that would be his truthful

17    answer, and I don't believe it would be appropriate because I

18    asked him that.  I --

19          MR. DUVA:  I just don't believe that's true.  I mean,

20    I'd have to see --

21          MR. STONE:  That's why he removed it --

22          MR. DUVA:  -- the information.

23          MR. STONE:  -- and I don't want to get into a

24    situation where he was asked either by -- and I don't recall

25    the Court doing it, but pretrial services all the time will

1     look at stuff and they'll say, "You can't do this."

2              THE COURT:  Do we have a document or something?

3              MR. DUVA:  I've never heard of it, never seen it,

4     never asked pretrial services to do that.

5              MR. STONE:  But that is going to be the answer, and I

6     don't believe it would be appropriate because he was abiding by

7     the requirements of pretrial services in this court.

8              MR. DUVA:  I don't believe for one second this is

9     true, but I'll ask him.  I mean, I'm going to cover that it was

10    on there basically.

11             THE COURT:  Okay.

12             MR. DUVA:  I mean, I'm going to stick to that.  I

13    know he removed it because I have the captures from a later

14    time postindictment, so I know it wasn't there at some point.

15             THE COURT:  Well, look, we know that you could check

16    it because it's all in the court records.  I just don't know --

17             MR. DUVA:  I just don't have any recollection of

18    that.

19             MR. STONE:  I don't believe it happened in a

20    courtroom.  I'm pretty sure, because when I asked him why he

21    removed it, he said, "Because I was told to remove it, so I

22    removed it."

23             THE COURT:  Well, first of all, you asked what it

24    was, so you can do that.  Ask him --

25             MR. DUVA:  I'm going to cover General Equity Building

```
 1    Society.
 2           THE COURT:  Fine.  We won't talk about -- we won't
 3    talk about it being removed.  He doesn't have to talk about it
 4    being removed.
 5           MR. STONE:  We could do it outside the presence of
 6    the jury.  We could do that.
 7           MR. DUVA:  I don't need to do that to get the point
 8    across.
 9           THE COURT:  All right.
10       (End of discussion at sidebar.)
11    BY MR. DUVA:
12    Q.   Mr. Rosenfeld, that's a reference on your website to the
13    General Equity Building Society?
14    A.   Yes.
15    Q.   When did you realize that was fraud?
16    A.   I never realized it was fraud.
17    Q.   Okay.  So we've got the HSBC letter, right?
18    A.   I never did any business --
19           MR. STONE:  Your Honor --
20    A.   -- with GEBS.
21    Q.   We offered in --
22           MR. STONE:  -- we're just covering the same ground --
23           THE COURT:  I don't --
24           MR. STONE:  -- over and over.
25           THE COURT:  What's the date of that letter?
```

```
1              MR. DUVA:  The website?

2              THE COURT:  No.  The date of the letter you're

3    talking about.

4              MR. DUVA:  July -- I have to look at the HSBC letter,

5    but I think that's July 2008.

6              MR. STONE:  It's the same material he's already

7    covered.

8              THE COURT:  I thought you were referring to the other

9    letter.

10             All right.  What's your question?  HSBC letter is

11   what?

12   BY MR. DUVA:

13   Q.   So you didn't realize the HSBC letter was fake.

14   A.   I'm sorry.  Repeat?

15   Q.   You didn't realize the HSBC letter was fake.

16   A.   Not at the time.

17   Q.   The Citi letter.

18   A.   Correct.

19   Q.   The JP Morgan Chase letter.

20   A.   Correct -- oh, no.  I did.  That's why I turned it in to

21   the Secret Service.

22   Q.   That's the one you consulted with the Secret Service as

23   a material witness?

24   A.   That's the one I turned in and I said, "I see a problem

25   here.  Why don't you investigate this."
```

1  Q.    And the BBVA Bancomer letter, which we went back and

2  forth on.

3  A.    Uh-huh.

4  Q.    All 13 Unistate deals.

5  A.    I wasn't involved in 13 Unistate deals.  I don't know

6  anything about --

7  Q.    All Unistate deals that you were involved in, right?

8  Didn't realize those either?

9  A.    All the information I had at the time I was operating, I

10  did not know there was a problem with them.

11  Q.    And you also didn't realize General Equity Building

12  Society was an issue.

13  A.    I still don't know it's an issue, and I discontinued

14  attempting to deploy the product because I became uncomfortable

15  with the product.  Never did a deal, never offered it to a

16  client.

17  Q.    You didn't offer it to Dwight Jenkins?

18  A.    No.

19  Q.    He said that you had better rates than Mr. Holland.

20         Do you recall that?

21  A.    I talked to many people about this, and at the time that I

22  was trying to find out if there was a market for it, I got many

23  calls on this deal, and I was quoting rates that I might be

24  able to do it for.

25         To move forward on the product, they would have had

1    to have sent me a complete business plan because this is an

2    SBLC, not proof of funds, so it's a totally different

3    underwriting structure.

4    Q.    So you would have --

5    A.    So all this was was an attempt to see if I could determine

6    if this was a valid product.  And at some point I determined it

7    was not a product that I should be involved in and discontinued

8    talking to anyone about it.

9    Q.    And --

10   A.    And, no, it never -- it never --

11   Q.    But you had it on your website.

12   A.    Because I was -- I had it on the website because at the

13   time I thought it might be a viable product.

14   Q.    But you weren't sure.

15   A.    For -- with all the information I had at the time, I

16   thought it was a viable product.

17   Q.    I guess what I'm wondering is, how long does it take for

18   you to realize something's not real?

19   A.    Until I get enough information and get deep enough into it

20   to get the information required.

21   Q.    But you're comfortable making money in that window

22   period of time, right?

23   A.    When I take money on any deal I do, I'm 100 percent

24   confident that the product that is being contracted and

25   provided is 100 percent legitimate.

1  Q.   When you did your research into Unistate, you came up

2  with the 412 Lake Road, Takapuna, Auckland, address?

3  A.   I did.

4  Q.   And are you aware how many entities in New Zealand

5  listed that as their address?  Did you research that?

6  A.   Did I search how many entities listed it as their address?

7  Q.   Yes.

8  A.   No, I did not.

9  Q.   Now, you're an e-mail/phone call kind of guy, right?

10 You're not going to meet people in person?  It's not the way

11 you do business?

12 A.   I do most of my business electronically.

13 Q.   If you had met Christopher Jaijairam on the plane flight

14 from Dallas to Yonkers, New York -- or I'm sure you would

15 have had to take several drives to get there -- do you think

16 you would have done business with him?

17 A.   Depends on how he presented himself and what he said in

18 the meeting.

19 Q.   Do you think it would have been a whole lot different

20 than he presented himself here?

21 A.   Oh, I think he would have presented himself totally

22 different than the way he did in court.

23 Q.   You made so much money with Unistate, I mean, looking at

24 your financial records and the significant bump in 2009, why

25 not continue?

1    A.   Because Mr. Holland needed me no longer.  I don't even

2    know if he was doing the deals.  I know he was looking at some

3    alternative finances -- financial arrangements.  And I only

4    responded to move on with deals when he indicated to me that

5    there was another -- another deal to work on.  I was not

6    selling or marketing these deals.

7    Q.   I mean, theoretically, though, Mr. Holland didn't really

8    need you at all after he got the contract the first time,

9    right?

10   A.   Well, I don't know about the first time.

11   Q.   Because you're one of the small percentage of people in

12   America that could come up with that document?

13   A.   That could understand the total relationships between his

14   contract and the contract being offered by the supplier, in

15   this case Unistate.

16   Q.   You're one of those small handful of people?

17   A.   Yes.

18            MR. DUVA:  Nothing further, Your Honor.

19            THE COURT:  Okay.  Any redirect, Mr. Stone?

20            MR. STONE:  Yes, Your Honor.

21                        REDIRECT EXAMINATION

22   BY MR. STONE:

23   Q.   Mr. Rosenfeld, I'm going to just ask a couple of

24   follow-up questions.  Hopefully it won't take too long.  I

25   know we've all been here all day.

1          First of all, I think that Mr. Duva was confusing

2    the issue on --

3          THE COURT:  Please don't make a speech.  Just ask a

4    question.

5    BY MR. STONE:

6    Q.   Let me ask -- let me try to clarify something.

7          The United States District Court, Eastern District

8    of New York, United States versus Dayana Mendoza, does that

9    ring a bell?

10   A.   Yes.

11   Q.   And what is that?

12   A.   That was one of the people that was charged in the case

13   that resulted from my turning over the information to the

14   Secret Service.

15   Q.   Okay.  And so when you were contacted by Secret Service

16   Agent Mike Purcell -- is that --

17   A.   Yes.

18   Q.   He was not talking to you about any of your

19   transactions.  He was trying to do -- trying to get

20   information about an investigation that didn't involve you,

21   correct?

22   A.   Correct.

23   Q.   Okay.  So you followed that up --

24         THE COURT:  Now, Mr. Stone, you're starting to give

25   another speech.

1            MR. STONE:  Okay.

2            THE COURT:  You can say, "What did you do next?" but

3    we don't want to have --

4            MR. STONE:  Okay.

5    BY MR. STONE:

6    Q.   With regard to your turning in that document we were

7    referring to, why did you turn that in to Mike Purcell?

8    A.   Because my perception was that that was a fake document.

9    Q.   Okay.  There was a situation where you refunded money

10   based upon a transaction that you determined was no good,

11   right?

12   A.   Correct.

13   Q.   Okay.  And why did you do that?  The money was already

14   out of escrow.

15   A.   Because in business you have to provide what you're paid

16   for, and since it turned out that we were paid for something

17   that turned out to be not what we promised, the customer was

18   due their money back, so we -- so we gave it back.

19   Q.   Mr. Duva was asking you why you're not refunding the

20   people in this case money.  We're now six years after the

21   fact or five years after the fact.

22            Have -- while this -- while these deals --

23            THE COURT:  Mr. Stone, it's another speech.  You can

24   say, "Why don't you pay them back?"  You can ask him that.

25            MR. STONE:  Well --

1          THE COURT:  Let him say it, not you.

2          MR. STONE:  Well, I'm going to -- I have to reference

3   the time frame.

4          THE COURT:  You've directed his attention.  The

5   question is, "Why don't you pay them back?"

6   BY MR. STONE:

7   Q.   When did you learn that the -- that -- what Mr. Duva is

8   suggesting is that the -- that the documents were -- were

9   fake?

10  A.   During this trial.

11  Q.   All right.  Now, Mr. Duva suggested that the Citibank

12  document -- that the account document regarding Dwight

13  Jenkins, Citibank El Salvador, was fake.

14         What did Dwight Jenkins testify to about confirming

15  the Citibank account?

16  A.   Dwight Jenkins testified that he took the login

17  information that was described by the Citibank witness, was

18  able to log on, access the account, see that it was in the name

19  of DealStructurer, and that that amount of money was in the

20  account.

21         He also testified that he didn't know if that was a

22  sub account or not.

23  Q.   Okay.  So somehow --

24         THE COURT:  No, no, please, not a speech.  What's the

25  next question?

1          MR. DUVA:  Just ask a question.

2          MR. STONE:  Excuse me?

3          MR. DUVA:  Just ask a question.

4          THE COURT:  Just ask a question.

5    BY MR. STONE:

6    Q.   Mr. Rosenfeld, are you familiar with what lawyers on

7    Wall Street make compared to what lawyers in Plano, Texas,

8    make?

9    A.   I have a general idea, depending upon the area of law that

10   they're working in.

11   Q.   Do you have any idea what the hourly rate difference is

12   in Plano, Texas, versus Wall Street, New York City?

13   A.   Well, I -- again, yes, I have a general idea based on --

14   depending what the work is that the attorney's doing.

15   Q.   If it was a difference between 150 an hour in Plano,

16   Texas, versus 1500 an hour in New York City, would that

17   surprise you?

18   A.   It wouldn't surprise me at all.  I've paid $15,000 an hour

19   for an attorney before.

20   Q.   So they're both reading things and arguing with people

21   on the witness stand.  Both doing the same thing.

22   A.   These are commercial lawyers, not criminal lawyers I'm

23   talking about.

24   Q.   Well, even commercial lawyers sometimes read documents

25   and argue --

1          THE COURT:  Mr. Stone, I think you've gone into this

2  enough.  It's perfectly obvious there are high-priced lawyers.

3  Enough, you know?  Enough.

4  BY MR. STONE:

5  Q.   In all types of business, do people have different fee

6  structures --

7  A.   Yes.

8  Q.   -- from what you know?

9  A.   Yes.

10  Q.   And depending upon where you are in the country or what

11  kind of business you're in, different types of fee structures

12  can result in different types of income levels, right?

13  A.   Yes.

14  Q.   So if Mr. Duva seems to be --

15          THE COURT:  Don't comment on Mr. Duva.  Please, we're

16  at a point, just ask a fact question.

17          Both sides are going to have a chance to argue and

18  don't have to argue when questioning witnesses.

19  BY MR. STONE:

20  Q.   Mr. Rosenfeld, did we try to put an expert witness on

21  the stand?

22  A.   Yes.

23          THE COURT:  I'll sustain the objection.  That's

24  really improper, plus there is no such witness, so move on.

25  BY MR. STONE:

1   Q.   Mr. Rosenfeld, if you knew that this was a scam and that

2   all these documents were fake, why did you have your name all

3   over the documents and money being wired directly into

4   accounts associated with you?

5           MR. DUVA:  Your Honor, I think we have another speech

6   and a leading question.

7           THE COURT:  I'll sustain the objection.

8           You can argue he put his name on it, which is -- your

9   argument, proves this.  I'll sustain the objection.

10          Just -- if there's any more fact questions for the

11  witness, please ask them, but let's not --

12  BY MR. STONE:

13  Q.   Mr. Rosenfeld --

14          THE COURT:  -- anticipate the argument you're going

15  to have a perfect chance to make on Monday.

16  BY MR. STONE:

17  Q.   Mr. Rosenfeld, was there anything stopping you, if you

18  knew it was a scam or a fraud, from taking all the money out

19  of escrow and taking it yourself?

20          MR. DUVA:  Objection, leading, speech.

21          THE COURT:  Well, it's a rhetorical question,

22  Mr. Stone.  Fine.

23          Was there anything stopping you from stealing the

24  money?  That's the question.

25  BY MR. STONE:

1   Q.   Right, from taking all the money.  Not giving it to

2   anybody else but just taking it yourself.

3   A.   I could have taken it all.

4   Q.   Okay.  What -- why didn't you?

5   A.   Because we were doing legitimate business, and everybody

6   got paid who was supposed to get paid what they were supposed

7   to get paid.

8   Q.   Based upon what?

9   A.   Based upon the contracts.

10  Q.   You were talking about understanding the contracts, and

11  I had gone over a little bit with you of the -- on the

12  safekeeping agreement and the business relationship

13  agreement.

14       From what you can tell, based upon this trial and

15  everybody you've spoken to, Agent Adams, Mr. Duva, everybody,

16  has anyone understood how -- has anyone read those contracts

17  and understood how that could happen -- how that could -- how

18  those contracts work in conjunction, from your perspective?

19       MR. DUVA:  Objection, leading.  Speech.

20       THE COURT:  I'll sustain the objection.

21       We're not going to have him comment on other people's

22  testimony.  This is redirect.  I insist that you have to ask a

23  fact question about something that Mr. Duva covered without a

24  speech, please.

25  BY MR. STONE:

1    Q.   Mr. Rosenfeld, when you were involved for that six or

2    seven months in the Unistate leased CD program deals, what

3    did you know about those deals in reference to the validity

4    of them?

5    A.   I knew they were all valid based on all the information I

6    had.

7              MR. STONE:   Thank you.   Nothing further.

8                         *   *   *   *   *

1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4    UNITED STATES DISTRICT COURT )

5    MIDDLE DISTRICT OF FLORIDA   )

6

7            I hereby certify that the foregoing transcript is a

8    true and correct computer-aided transcription of my stenotype

9    notes taken at the time and place indicated therein.

10

11           DATED this 25th day of April, 2015.

12

13                              s/Shelli Kozachenko
                                Shelli Kozachenko, RPR, CRR
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25